[Nos. D028915, D030826. Fourth Dist., Div. One. Sept. 22, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
GODOY ANTHONY HALE, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of Facts part B and Discussion parts II through VII.

**COUNSEL**

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Laura W. Halgren and Arlene Aquintey Sevidal, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BENKE, J.**—Godoy Anthony Hale appeals judgments following two jury trials. In the first trial, a jury convicted Hale of: (1) torture (Pen. Code, § 206[2]); (2) first degree burglary (§ 459); (3) assault with a deadly weapon or instrument by force likely to produce great bodily injury (§ 245, subd. (a)(1)); (4) making a terrorist threat (§ 422); and (5) stalking (§ 646.9, subd.

---

[2]All statutory references are to the Penal Code unless otherwise specified.

(a)). In the second trial, a jury convicted Hale of one count of solicitation of murder (§ 653f, subd. (b)) and acquitted him of a second count of the same crime.

On appeal, Hale contends: (1) the evidence was insufficient to support his conviction for torture; (2) assault with a deadly weapon or instrument by force likely to produce great bodily injury is a lesser included offense of torture, and therefore he was improperly convicted of both crimes; (3) in the first trial, his trial counsel provided ineffective assistance of counsel because she failed to move to exclude statements he made to a cellmate; (4) in the second trial, the trial court erroneously denied Hale's motion to exclude statements he made to an investigator posing as a hit man; (5) the sentence for terrorist threats should be stayed pursuant to section 654; (6) the punishment for torture is a determinate sentence, therefore the trial court erred by failing to select it as the base term; and (7) the trial court made calculation errors when computing Hale's presentence custody credits.

We conclude only appellant's contention regarding calculation of presentence credits has merit. Accordingly, we affirm the judgment in all respects save the matter of custody credits.

FACTS

A.   *Case No. SCE 174700—Torture, Assault, Burglary, Terrorist Threats and Stalking*

   1.   *Prosecution Case*

     a.   *Hale's Relationship With Bracks*

Roanne Bracks[3] and her daughter Alexis were sharing an apartment in Mission Valley with Priti Pal. In January 1996, Bracks met Hale while both were students at University of California at San Diego, and they started dating. Hale knew that Bracks previously had a romantic relationship with Lamont Horton and that Horton was Alexis's father.

In early 1996 at Hale's apartment, Bracks was arguing with Horton on the telephone. Hale grabbed the receiver from Bracks and shouted to Horton: "This is my girlfriend now," "You don't talk to her that way," "You want to meet? I'll kick your ass. And that is Compton Crip, Motherfucker," and "I'll

---

[3]We note Bracks married during the proceedings. She is referred to as Roanne Bracks in the first trial and Roanne Horton in the second. We refer to her as Bracks throughout this opinion for purposes of clarity.

meet you somewhere." They planned to meet and fight at Bracks's apartment.

Bracks and Hale drove to Bracks's apartment; however Horton did not show up. Later, Horton telephoned them, and Hale told Horton: "See, you're a little punk. You didn't even show up. You don't have the balls. You make little threats, and don't back them up. I back up my threats," and "I'll kill you, motherfucker. I'll kill you." Later that same day Bracks noticed Hale had a metal pipe in his pants pocket.

Bracks continued to date Hale; however Hale became increasingly possessive and controlling. In April 1996, Bracks criticized Hale for leaving a wet towel on the bathroom floor. Hale became enraged and said: "Don't tell me what to do," and "You're pissing me off the way you're talking to me. You better shut up or you're going to see what's going to happen to you." Bracks asked if he was threatening to hit her, and Hale responded: "Just shut up," and "Don't talk to me like that. My mother doesn't tell me what to do. You sure as hell aren't going to tell me what to do." Hale grabbed Bracks and held her in a "neck lock," causing her lip to bleed. Bracks's daughter was in the room and started to cry. Hale finally let Bracks go, and she ordered him out of her apartment.

Hale and Bracks's relationship did not improve, and they continued to argue. By May 15, 1996, Bracks ended the relationship. Hale pleaded with Bracks to reconsider but Bracks refused. Hale told her: "You're pissing me off," "You don't want to be my enemy," "I don't have time for you anyway," and "I got bitches lined up."

b.  *Car Vandalized; Threatening Voice Mail Message*

On May 24, 1996, Bracks discovered a brick had been thrown through her car's rear windshield and two tires had been slashed. When Bracks went to her car to put plastic over the broken windshield, she noticed Hale's car parked nearby, and she walked towards it to see if Hale was inside. As she approached, Hale's car sped away. Although she was unable to clearly see the driver through the tinted windows, the body, face and nose resembled Hale. Bracks was frightened and she telephoned Horton asking him to come over.

Later that evening, Bracks received a message from Hale on her answering machine: "Hey, do yourself a favor. Save your tears,' cause you're gonna need 'em. We got plans for you nigger. Yeah." This message terrified Bracks. She borrowed her roommate's car, and Bracks, Horton and their

daughter Alexis drove to her brother's residence; Horton's van remained in the parking lot of Bracks's apartment.

### c. *Lug Nuts Taken From Horton's Van*

Later that evening just before midnight, Randolph Wood, the security guard for Bracks's apartment complex, observed a thin Black male carrying a tire iron. Wood called the police; while waiting for the police to arrive, Wood saw the man with the tire iron enter a car with license No. 3NIS381.[4] Wood then noticed the lug nuts to Horton's van had been removed.

### d. *Altercation Between Horton and Hale*

That same evening, Bracks, Horton and Alexis arrived at the residence of Bracks's brother. Horton asked Bracks to show him where Hale lived. They drove to Hale's apartment and briefly parked nearby. Just as they started to leave, Hale arrived in his car and swerved as if to hit them. Hale pursued them and cornered their car in a driveway.

Horton and Hale exited their vehicles. Horton had a gun and fired a shot towards the back window of Hale's car. Hale threw a metal pipe at Horton. Horton fired two shots, one of which hit Hale in the back. Hale and Horton fought over the pipe.

The police were summoned. While Horton was being arrested, Hale said to Bracks: "You're going to have a horrible life," "Your friend is going away for murder, attempted murder," and "Your daughter is going to grow up without a father." Hale then said to Bracks in a threatening tone "I am going to kill you, bitch," and he laughed.

### e. *Case Against Horton*

Horton was charged with attempted murder and assault with a deadly weapon. Hale told Deputy District Attorney Lorraine Rooney he would drop the charges against Horton if she prosecuted Bracks instead. Rooney explained to Hale there was no evidence Bracks had committed any crime. Hale responded that "wasn't a problem, that the situation would be cured" and "[o]ther people [would] take care of [the problem]."

Rooney confronted Hale about several discrepancies in his description of events on the night of the shooting. Hale admitted to Rooney he had

---

[4] It was later determined that the car was registered to Hale's father, and was the same car Bracks identified as belonging to Hale.

removed the lug nuts from Horton's van. Hale later threatened Rooney if she did not prosecute Bracks he would refuse to testify at Horton's trial; he further threatened to sue the district attorney's office and inform the media about the case.

Horton pleaded guilty to assault with a deadly weapon and received a one-year jail sentence. Horton and Bracks became engaged to be married, and she kept a wedding planning book, entering the names, telephone numbers and addresses for potential guests.

### f. *Continued Threats Against Bracks*

The day after the shooting, Bracks and Pal were at their apartment. More than 25 hang-up calls were received. In an attempt to determine who was placing the hang-up calls, Pal pressed "star 69," a custom telephone calling feature which dials the number of the last call received; the person answering the call said "[t]his is Sharp Hospital." Hale had been taken to Sharp Hospital after the shooting; Bracks believed Hale was placing the calls, and she was extremely frightened. Bracks reported the hang-up calls to the police, and they advised her to move out of the apartment immediately. Shortly thereafter, Bracks, Alexis and Pal moved into the home of Bracks's aunt, Kathy Graham, in Alpine.

Bracks kept both her pager and cellular telephone numbers. She received many pages with the message "187" which she knew to be a Penal Code section number associated with murder. She also received pages that read "60004-187," and she associated the first five numbers with Godoy, Hale's first name.[5]

On June 7, 1996, Hale called Bracks on her cellular phone. He told her "You know I'm going to kill you when I see you, right?" He threatened to "fuck [Bracks] up real good," and he said he "had ten niggers ready to pop [Horton] when they released him from jail."

On August 5, Bracks received a page from a number she did not recognize; she dialed the number and Hale answered. At first he sounded calm and peaceful, and he said he wanted to talk to her in person. Bracks refused, and Hale responded: "When I see you, I'm going to bust your fucking head with a hammer." Bracks changed her pager and cellular phone numbers, and she did not receive any more "187" pages or threatening calls from Hale.

---

[5]Bracks testified in "pager talk" numbers are used to represent similarly shaped letters. Therefore, "6" represents "G," the first "0" represents "O," the second "0" represents "D," the third "0" represents "O," and the "4" represents "Y."

In late August, Bracks, her mother and Alexis moved to El Cajon. They again tried to keep their location a secret. In September, Bracks began attending classes at San Diego State University, and she also worked as a swing-shift clerk at Kaiser Hospital.

### g.    *Hale Attacks Bracks With a Ball Peen Hammer*

On October 25, 1996, Bracks arrived home from work at approximately 11:45 p.m. She went to bed at midnight, and her three-year-old daughter Alexis slept beside her in the same bed. There was a night-light in the bedroom.

She was awakened by a loud cracking sound from a hammer hitting her face. Bracks screamed, opened her eyes and saw Hale standing over her. He was wearing a black hat with "South Central L.A." lettering which he often wore. Hale then shouted angrily "Die, bitch" and something to the effect of "That's what you get" or "You're going to get it." Hale struck Bracks in the face with the hammer a second time. Bracks blacked out momentarily.

Bracks regained consciousness and was able to rise from her bed. At first she ran out of her bedroom, but she returned to get her crying daughter to safety. Bracks saw Hale crouched down in a squatting position as if he was trying to hide behind the door. Bracks carried Alexis to her mother's room. Although she had trouble speaking because her face was "all broken," she told her mother to watch Alexis and call "911."

Police officers arrived and investigated the crime scene. The officers recovered two items from Bracks's bedroom that did not belong to her or her family. They found a ball peen hammer with a "G" etched on it, and it was determined to be the attack weapon. The officers also found a black cap with "South Central L.A." lettering at the foot of the bed. Subsequent DNA analysis matched the cap's sweatband with Hale's genetic profile.[6]

The only items missing from Bracks's home were one page from Graham's phone bill, and Bracks's wedding planning book. Graham's unlisted phone number appeared on her phone bill. The name, address and unlisted phone number for Richard Benbow, a friend of Bracks, were listed in the wedding book.

An ambulance took Bracks to a nearby hospital. Injuries suffered from the attack included a split lip, a cut under her eye and numerous broken and

---

[6]According to expert testimony at trial, only 1 person in 38,000 would share that same genetic profile with Hale.

chipped teeth. Treatment included stitches to her lip and face, a root canal, tooth extraction and bridge work.

### h. *More Threats Against Bracks, Her Family and Friends*

The day following the attack, Bracks's aunt received a call on her unlisted telephone number from someone who asked to speak to "snaggle tooth."[7] The caller said: "This is Eric, [Hale's] brother. And you tell snaggle tooth we have a message for her," and "You tell her the next time we see her, we're going to slit her throat and burn her ass. You got that?"

That same day, Benbow received a voice mail message on his unlisted phone number from an unidentified man who told him to "watch [his] back." Benbow then telephoned and spoke briefly with Hale's father. The following day, Benbow received a second voice mail message from the unidentified man: "You keep wolfin' that bullshit nigger, you gonna get tired of six niggers sittin' front of your apartment waitin' for your ass to come home or we catch you. . . . Keep wolfin' that shit nigger and it's gonna be your ass, mother fucker, this is _____ straight up mother fuckin' mafia nigger."

### i. *Hale Requests Cellmate to Procure Alibi Witnesses and a Hit Man to Kill Bracks and Horton*

Hale was arrested for the hammer attack and was held in the protective custody wing of Bailey Detention Center. While awaiting trial, Hale threatened to stalk and kill two guards.

Hale was housed in a cell adjacent to Kevin Murdock.[8] Murdock was awaiting sentencing of up to 10 years as a result of theft charges. Hale asked Murdock if he had any friends who would falsely testify Hale had nothing to do with the hammer attack and that Bracks had accused Hale only because he had "dogged her."

Hale told Murdock he also needed a female witness to call the district attorney's office just long enough for it to register on phone records. At trial, the witness would then testify she called the district attorney's office to inform them of Bracks's admission, but no one answered. Hale told Murdock he also wanted two other female witnesses to provide alibi testimony. Hale told Murdock his father would pay money for the perjured testimony. Hale's father subsequently deposited $160 in Murdock's prison account.

---

[7]"Snaggle tooth" is apparently a reference to Bracks, whose teeth had been broken during the hammer attack the previous night.

[8]Also spelled in the record on appeal as "Murdoch." Murdock was known by various aliases, including "Lavelle Davis."

Hale also told Murdock he wanted to hire someone to kill Bracks and Horton. He said Bracks was "ruining his life," by appearing on television talk shows. Murdock at first said he did not know if he could "have that done," but later he told Hale he knew someone who could possibly kill Bracks. Hale said money was not a problem, and he suggested a drive-by shooting in front of Bracks's residence. Hale gave Murdock written directions to Bracks's house, her work schedule and driving times between Bracks's workplace and home. Hale told Murdock that Bracks arrived home from work at 11:45 p.m. "like clockwork," and that would be the best time to kill her.

Hale also told Murdock his concerns about the pending case against him. Hale said he was careful not to leave any fingerprints at the crime scene, however he was worried DNA evidence would be used against him. Hale was also worried former girlfriends would testify against him.

On January 7, 1997, Murdock first contacted the district attorney's office and gave an investigator the information and materials he had received from Hale. Murdock agreed to testify against Hale in the hope he would receive favorable treatment when he was sentenced; however there was no deal for a specific sentence in exchange for his testimony.

### j. *Former Girlfriend Comes Forward*

The hammer attack was well publicized. Jamika Seals, a former girlfriend of Hale, contacted the district attorney's office after watching a television talk show story about Hale and Bracks.

Seals dated Hale for approximately one year while she was a high school senior. She ended the relationship in April 1994. Shortly after the breakup, Hale told Seals he wanted to resume their relationship. Seals refused, and Hale "socked" her in the face. Seals's shirt was torn, and she bled from the blow.

Hale then started loitering around Seals's apartment. Hale left a letter on her doorstep which said he was going to "get her" and referred to Seals as a "bitch." On another occasion, Hale startled Seals as she was emptying the trash.

At 4:00 a.m. on the night of her high school graduation, Hale waited for Seals outside the security gate to her apartment complex. She ran into the complex while friends prevented Hale from reaching her. The following day, Seals was sitting on the street curb, waiting for a ride to a party. Hale drove

up, called Seals a "bitch," got out of his car and struck her in the face. A passerby intervened and stopped them from fighting.

Later that summer, Seals was walking across a field with her friend Devarro Starks. Hale ran towards them and struck Starks in the head with a metal object. Hale later telephoned Seals, telling her "I'm going to get your f-ing boyfriend, and I can get all your friends."

While Seals attended a family funeral in Illinois during December 1994, her mother's house was burglarized and her father's dog Buffy disappeared. Seals received a telephone call from Hale telling her Buffy was dead. After returning to her mother's house, she inspected her high school yearbook and discovered Hale had written "Buffy no longer lives, ha-ha, nigger" over a picture of Hale and Seals at her homecoming dance.

### 2. Defense Case

Hale presented an alibi defense. Hale's friend Eric Butler testified that he was with Hale in Los Angeles the evening of the hammer attack. Hale's father corroborated parts of Butler's testimony. Hale's father further testified he never saw his son wear a hat with "South Central L.A." lettering.

Hale testified in his own defense. He described his relationship with Seals as "intense," and he admitted to hitting her once. He denied burglarizing Seals's residence or taking Buffy. Hale largely denied allegations concerning his relationship, stalking and attacking of Bracks.

### 3. Rebuttal

On January 24, 1997, San Diego Police Officer Jovanna Derrough posed as "Janet" and spoke with Hale's father about Hale's need for perjured alibi testimony.

Seals's mother corroborated her daughter's testimony regarding Hale striking and threatening her. Seals's father testified Hale left messages on his telephone answering machine; Hale threatened to get "homies to come and shoot up the house." Furthermore, the day after his dog Buffy disappeared, he found Buffy's torn dog clothes on his doorstep, and someone had recorded the song "The Dog Catcher" as a message on his answering machine.

### 4. Verdict

The jury convicted Hale on all counts as follows: (1) torture (§ 206); (2) first degree burglary (§ 459); (3) assault with a deadly weapon or instrument

by force likely to produce great bodily injury (§ 245, subd. (a)(1)); (4) making a terrorist threat (§ 422); and (5) stalking (§ 646.9, subd. (a)).

B.   *Case No. SCE 130409—Solicitation of Murder**

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISCUSSION

I

Hale challenges the sufficiency of the evidence to support the torture conviction.

In cases where a defendant challenges the sufficiency of the evidence on appeal, "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] In cases in which the People rely primarily on circumstantial evidence, the standard of review is the same. [Citations.]" (*People* v. *Thomas* (1992) 2 Cal.4th 489, 514 [7 Cal.Rptr.2d 199, 828 P.2d 101].)

"Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.] 'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.' [Citation.]" (*People* v. *Bean* (1988) 46 Cal.3d 919, 932-933 [251 Cal.Rptr. 467, 760 P.2d 996].) The determination of a witness's credibility and the truth or falsity of the facts upon which such determination depends is within the exclusive province of the jury. (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303 [228 Cal.Rptr. 228, 721 P.2d 110].)

Section 206 provides: "Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion,

*See footnote 1, *ante*, page 94.

persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture. [¶] The crime of torture does not require any proof that the victim suffered pain." Hale contends there was insufficient evidence to show he intended to cause cruel or extreme pain and suffering. Although Hale concedes the evidence shows he intended to assault Bracks, possibly even kill her, Hale contends there was not sufficient evidence he intended to torture her. We disagree.

Intent to cause cruel or extreme pain can be established by the circumstances of the offense. (*People* v. *Jung* (1999) 71 Cal.App.4th 1036, 1043 [84 Cal.Rptr.2d 5].) We note a ball peen hammer is a machinist's hammer, and it has "a hemispherical peen" for beating metal. (Webster's New Internat. Dict. (3d ed. 1993) p. 168.) It is reasonable to infer when Hale twice aimed and struck the ball peen hammer at Bracks's face, he intended to cause her to suffer extreme or cruel pain. Moreover, the injuries suffered by Bracks also support such an inference. Multiple teeth were cracked and broken, her lip was split and she sustained a cut under her eye. Immediately after the attack, Bracks had difficulty talking because her face was "all broken."

Other circumstances of the offense also suggest Hale intended Bracks to suffer not only extreme or cruel physical pain, but also extreme mental pain and terror. Hale entered Bracks's bedroom in the middle of the night. He attacked her while she was asleep, with her three-year-old daughter in bed beside her. He struck her once while she slept, and then a second time after she awoke screaming. Hale did not strike Bracks again nor immediately flee but instead crouched down beside the door as if hiding, allowing him to observe her pain and terror.

Bracks not only suffered physical pain from the blows but also felt extreme fear for the safety of her daughter who was present during the attack. It is reasonable for a jury to infer that by attacking Bracks with a hammer at night when she was asleep in bed with her daughter beside her, Hale intended to cause Bracks to suffer cruel physical pain as well as extreme anguish and terror.

To the extent Hale contends his intent was shown only by his shouting "Die, bitch" during the attack and such intent is inconsistent with torture, we reject that contention as a misstatement of the law and evidence. A jury could reasonably have concluded Hale had multiple criminal objectives during the attack. As we have already noted, Hale *also* angrily shouted "That's what you get" or "You're going to get it" between the two blows

with the hammer. These statements suggest Hale intended to cause Bracks to suffer cruel pain for the purpose of revenge. Although "Die, bitch" may evidence an intent to murder, there is sufficient evidence Hale also harbored an intent to torture Bracks.

Furthermore, the perpetrator's intent to cause cruel or extreme pain "can be established not only by the circumstances of the offense, but also from other circumstantial evidence. [Citations.]" (*People* v. *Jung, supra,* 71 Cal.App.4th at p. 1043.) During the six-month period prior to the hammer attack, Hale repeatedly threatened Bracks, expressing his desire to harm her. After Bracks ended their relationship, Hale warned her: "You're pissing me off. . . . You don't want to be my enemy." In May 1996, Hale left a message telling Bracks to "[s]ave your tears,' cause you're gonna need 'em. We got plans for you." After he had been shot by Horton, Hale told Bracks: "You're going to have a horrible life." Hale then attempted to coerce the district attorney's office to prosecute Bracks instead of Horton for the shooting, even though there was no evidence Bracks had committed any crime. In June 1996, Hale left threatening "187" pager messages, and he told Bracks: "You know I'm going to kill you when I see you right? . . . Fuck you up real good." Less than three months prior to the attack, Hale told Bracks: "When I see you, I'm going to bust your fucking head with a hammer." All of these statements are circumstantial evidence not only that Hale sought revenge for Bracks ending their relationship and Horton shooting him, but also Hale intended to terrorize Bracks and cause her to suffer extreme physical pain and mental anguish.

To the extent Hale relies on the facts and circumstances of murder by torture and other torture cases in an attempt to argue his acts were not so egregious, we reject that contention as a misstatement of the law. Proposition 115, adopted by the voters in 1990, created the relatively new crime of torture. ▮ "Torture is a new crime, different from others." (*People* v. *Barrera* (1993) 14 Cal.App.4th 1555, 1566 [18 Cal.Rptr.2d 395].) It is a major crime and "fills a gap in existing law dealing with extremely violent and callous criminal conduct . . . . Section 206 is the electorate's response to a particular type of violence animated by a discrete and especially reprehensible intent." (*Id.* at p. 1573.) The intent required for torture as defined by section 206 is not identical to the intent for murder by torture under section 189. (*People* v. *Aguilar* (1997) 58 Cal.App.4th 1196, 1206 [68 Cal.Rptr.2d 619] [premeditation element of section 189 but not section 206]; *People* v. *Vital* (1996) 45 Cal.App.4th 441, 444 [52 Cal.Rptr.2d 676] [a premeditated intent to cause pain not a requirement of section 206].)

To the extent Hale suggests the brevity of the attack precludes his harboring an intent to torture, we reject that contention as a misstatement of

the law. ▮ Although a prolonged attack may be circumstantial evidence of an intent to cause cruel or extreme pain, neither the intent to cause nor the actual causing of prolonged pain is a requirement of torture as defined in section 206. (*People* v. *Aguilar, supra,* 58 Cal.App.4th at pp. 1204-1205; *People* v. *Vital, supra,* 45 Cal.App.4th at p. 444.)

▮ Hale further suggests the injuries sustained by Bracks are insufficient to support a torture conviction.[9] We disagree. Section 206 only requires "great bodily injury as defined in Section 12022.7," which is "a significant or substantial physical injury." (§ 12022.7, subd. (e).) "Abrasions, lacerations and bruising can constitute great bodily injury. [Citation.]" (*People* v. *Jung, supra,* 71 Cal.App.4th at p. 1042.) Bracks's broken and smashed teeth, split lip and cut under her eye are sufficient evidence of great bodily injury.

In making his arguments that the brevity of the attack and extent of injuries inflicted are insufficient to support a torture conviction, Hale misses the critical point that torture as defined in section 206 focuses on the mental state of the perpetrator and not the actual pain inflicted. (*People* v. *Jung, supra,* 71 Cal.App.4th at pp. 1042-1043.) As we have already noted, Hale previously terrorized and threatened his former girlfriend Seals and her family, burglarized Seals's home, killed the family dog and physically assaulted her. His relationship with Bracks showed a similar pattern, suggesting the same criminal mental state. Most importantly, his attack on Bracks was cold-blooded and cruel: he entered her house in the middle of the night, stood over Bracks and her daughter asleep in bed, struck Bracks in the face with a ball peen hammer, heard her scream, threatened her, struck her a second time, hid in her bedroom and then left taking Bracks's wedding planning book with him. The record on appeal contains substantial circumstantial evidence satisfying all the statutory elements of torture.

II-VII*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The cause is remanded to the superior court with instructions to modify the abstract of judgment to reflect that appellant is entitled to an additional

---

[9]Hale contends "[Bracks's] injuries were not life-threatening, did not result in any hospitalization (Ms. Bracks was treated in the emergency room and released), and did not result in any permanent disfigurement." Hale also asserts Bracks's facial injuries have healed and she is now an "attractive woman."

*See footnote 1, *ante,* page 94.

49 days of presentence custody credits.[12] In all other respects, the judgment is affirmed.

Kremer, P. J., and Nares, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 21, 1999.

---

[12]See *ante*, footnote 1.