Filed 3/6/13  P. v. Elias CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054060 |
| v. | (Super.Ct.No. RIF10000872) |
| RUBEN ANTHONY ELIAS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  John D. Molloy, Judge. Affirmed.

David McNeil Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Scott C. Taylor and Nguyen Tran, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Ruben Anthony Elias guilty of torture (Pen. Code, § 206, count 1);[1] inflicting corporal injury on a spouse (§ 273.5, subd. (a), count 2); assault with a deadly weapon (§ 245, subd. (a)(1), count 3); and making criminal threats (§ 422, count 4). The jury also found that in the commission of counts 1, 2, and 3, defendant used a deadly and dangerous weapon, to wit, a belt, (§ 12022, subd. (b)(1)); and that in the commission of count 1, defendant inflicted great bodily injury upon the victim (§ 12022.7, subd. (a)). As a result, defendant was sentenced to a total indeterminate term of eight years to life in state prison. Defendant's sole contention on appeal is that there was insufficient evidence to support his conviction for torture. We reject this contention and affirm the judgment.

I

FACTUAL BACKGROUND

A. *Background*

Jane Doe No. 1 (Jane) and defendant met in Minnesota around 2004 or 2005, and began dating in 2006. Jane was 16 years old, and defendant was 24 years old at the time. In 2008, they moved to California and had two daughters together. Defendant had two sons from a previous relationship. Defendant worked while Jane stayed home and cared for the children.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

B.    *Prior Acts of Abuse Involving Jane*

Beginning in 2006, defendant began to physically abuse Jane.  Specifically, in 2006, defendant choked her on two separate occasions because he was jealous of other men.  After they moved to California, defendant continued to physically abuse Jane.  On one occasion, defendant forcefully punched her on the arm, leaving a mark, because she accused him of cheating.  On another occasion, defendant choked and punched Jane because she forgot to pay the electric bill.  Jane never told anyone about the abuse because she was scared, and defendant had threatened to kill her if she ever took his kids away from him.

C.    *Current Charged Incidents of Abuse*

On February 21, 2010, Jane went to a grocery store where she talked with a man and exchanged phone numbers with him.  When she returned home, defendant was watching television with their daughters and asked Jane for her cellular phone.  As he looked through her phone, she told him that she had met a man at the grocery store and that they had exchanged phone numbers.  She also explained that there was nothing going on, and that she was just trying to make friends.  Defendant became visibly upset and began raising his voice.

Defendant accused Jane of wanting to be with this man.  She told defendant that she was just making friends and that she was not interested in the man.  They continued to argue over the matter.  Defendant eventually told Jane to ask the man to send her a picture of him over the phone.  She complied because she was scared of defendant.  The

man sent a picture of his face. After seeing the picture, defendant became even more visibly upset, took her phone, and kept it.

Defendant then grabbed a belt from the closet and began to beat Jane with the leather end. For about 10 minutes, defendant hit her four to five times with the belt on her shoulders and back. The beating hurt much more than the previous times when he had punched her. She cried throughout the attack and screamed for defendant to stop. Jane believed defendant was acting irrationally and appeared enraged and out of control. Defendant eventually stopped and left the room. Jane remained in the room and put on a sweatshirt to hide the bruises on her back and shoulders.

Sometime later, defendant came into the room and asked Jane to clean the house with him and his boys. She obediently complied. About 30 minutes after the beating, defendant demanded that she go to the Laundromat with him and the children. On the drive over, defendant reached over and punched Jane in the chest with the side of his closed fist while she sat in the front passenger seat. She asked defendant to stop because the children were in the car. Defendant loudly said no and began painfully pinching her leg. Jane was crying and asking defendant to stop. When they got to the Laundromat, she went inside with the boys while defendant stayed in the car with the girls. When Jane got back into the car, defendant again gave a long, hard painful pinch on her leg. On the drive home, defendant again hit her in the chest. She had a bruise on her chest and four bruises down her leg as a result of the abuse.

When they returned home, defendant followed Jane into the master bedroom. As soon as they got into the room, defendant grabbed Jane, threw her to the floor, grabbed a

4

game system cord, and started beating her with it. He hit her legs, arms, and back. He continued to repeatedly whip Jane with the cord for about 10 minutes as she curled up on the floor and tried to protect her face with her hands. Jane was crying, screaming, and repeatedly asking him to stop. Jane described the pain as a 10 on a scale from one to 10. After he stopped beating Jane with the cord, defendant told Jane that she was lucky he did not kill her and bury her in the backyard so that nobody could find her. He then took the cord and tried to wrap it around her neck. Jane believed that defendant was trying to kill her and held onto to the cord so that it could not go lower than her nose. Defendant eventually gave up, said that she had asked for the beating, and left the room. When defendant returned, he began kicking and hitting Jane with a shoe. He also kicked her right pinky as she protected her face. Jane wanted to leave but was scared that he would find her and hurt her.

Later that night, as Jane was in bed, defendant came to her and told her that the kids were sleeping the way they were because it was her fault that everything was happening. Jane did not say anything in response but got up and brought the girls back into the master bedroom to sleep on their mattress. She then got into bed with defendant. After about 15 minutes, defendant punched the left side of her jaw, leaving another bruise. Jane remained silent, too scared to say anything. Defendant continued to tell her it was her fault.

When Jane woke up the next morning at 7:00 or 8:00 a.m., she could barely move and her pinky was swollen. She told defendant her pinky was broken, but defendant said it was not. He continued to bring up the subject of the man that she had met the day

5

before at the grocery store. Defendant did not go to work because he did not trust her to be alone at the house. Although defendant left the house twice in order to take the boys to school and run errands, Jane did not leave the house because she was afraid he would come back. She also could not call anyone because defendant still had her phone.

At 7:00 or 8:00 p.m., defendant again began questioning Jane about the man from the grocery store. He asked her if she liked him and if she had gotten his phone number because she wanted to be with him. When she answered, he told her she was lying and began beating her with the belt, hitting her repeatedly across her legs and arms as she lay in bed. She was screaming and asking defendant to stop because her pain was even worse. Defendant, however, told her that she needed to stop lying and continued to beat her, striking her legs as well as her face, leaving a red mark near her eye. He continued to beat Jane until she finally told him what he wanted to hear—that she had given the man her number because she wanted to be with him. After about an hour, they both went to bed.

The next day, on February 23, 2010, defendant left for work and took the keys to their other car with him. Jane looked through one of their moving boxes and found her old cellular phone. She then called the police. A recording of Jane's 911 call was played for the jury. Jane was crying and said, "Yesterday and the day before, my boyfriend kept beating me up." She also said that if she left, defendant was going to kill her.

About 8:30 a.m., Riverside Police officers arrived at the house. Officers observed visible bruises on Jane's face and wrists. While alone in a bedroom with a female officer, Jane took off her sweatshirt and revealed the rest of her injuries. About 35 minutes later, defendant returned in his work truck and was arrested at gunpoint.

Dr. Richard Guth, an emergency physician at Riverside Community Hospital, examined Jane. He noted that Jane's injuries stood out to him as out of the ordinary because she had abnormally widespread and significant visible bruising. An X-ray of her pinky finger revealed that the finger was broken. She later had surgery on her pinky finger, and pins were placed inside. At the time of trial, she did not have full movement in that finger and was still receiving physical therapy.

D.    *Prior Uncharged Acts of Domestic Violence Involving Jane Doe No. 2*

Jane Doe No. 2 is the mother of defendant's two sons. She testified that on one occasion, defendant had snuck into her car while she and a neighbor friend were inside a club. On the drive home, Jane Doe No. 2 talked with her neighbor about a man she had met at the club. Defendant suddenly appeared, grabbed the steering wheel, and began yelling about her talking to another man. Eventually, defendant calmed down and let go of the steering wheel. Jane Doe No. 2 then drove to her house.

When Jane Doe No. 2 and defendant returned home, they went to her room where they talked. She told defendant that she was not with him anymore and that she did not want to be with him. Jane Doe No. 2 and defendant had not been romantically involved for over a year at the time. Defendant became angry, grabbed her neck, pushed and held her down on the bed, and tried to smother her face with a pillow. Jane Doe No. 2 swung

7

her armed and pushed on him to get him off of her. Defendant eventually let go, apologized and left when she threatened to call the police. She never called the police.

E. *Defense Evidence*

Defendant testified that he got into an argument with Jane after finding the number of the man on her cell phone. He denied hitting Jane during this fight or punching her while in the car or threatening to kill her. He, however, admitted to pinching her three to four times but after she had pinched him first. He also acknowledged hitting Jane with the cord after he found Jane in their bedroom closet texting the man she had met at the grocery store. He claimed he was angry and lost control. He did not recall how long the beating lasted or how many times he hit her. He believed that he may have punched her during the beating, but denied punching her in the face while they were in bed or beating her a third time with the belt. Defendant admitted to causing the injuries suffered by Jane that were shown in the photographs. He denied intentionally taking Jane's phone and stated that he was sorry that he had hit Jane.

Defendant also denied strangling Jane Doe No. 2, and he claimed that the incident never happened. He explained that Jane Doe No. 2 made up the allegation because she may have been angry at him for having full custody of their sons.

II

DISCUSSION

Defendant contends there was insufficient evidence to convict him of torture, arguing that evidence of his intent was insufficient to rise to the level contemplated by the torture statute. Although he concedes the evidence was sufficient to prove he had inflicted great bodily injury on Jane, he urges that there was inadequate evidence to show his conduct was to cause "cruel and extreme" pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose when he beat her.

When the sufficiency of the evidence is challenged, "'we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Hale* (1999) 75 Cal.App.4th 94, 105; see also *People v. Johnson* (1980) 26 Cal.3d 557, 578.) "'[I]t is the jury, not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] Therefore, an appellate court may not substitute its judgment for that of the jury.'" (*People v. Sanchez* (1998) 62 Cal.App.4th 460, 468, quoting *People v. Ceja* (1993) 4 Cal.4th 1134, 1138-1139.) We presume, in support of the judgment, the existence of every fact the jury reasonably could deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

Torture is defined in section 206 as follows: "Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture. [¶] The crime of torture does not require any proof that the victim suffered pain." Section 12022.7, subdivision (f), defines great bodily injury as "a significant or substantial physical injury." Therefore, torture consists of two elements: (1) a person inflicted significant or substantial physical injury upon another, and (2) that person did so with the specific intent of causing cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or any sadistic reason. (*People v. Pre* (2004) 117 Cal.App.4th 413, 419.)

While conceding he had inflicted significant injury upon Jane, defendant attempts to argue that Jane's injuries were insufficient to establish his intent required under the statute because Jane's injuries "were not as aggravated as those" in other torture cases. He supports his position by citing to a number of torture cases, and he asserts that the injuries in this case "simply do not rise to the level of cold blooded intent to inflict cruel and extreme pain that is found in th[o]se other cases of torture." We reject this argument.

In *People v. Jung* (1999) 71 Cal.App.4th 1036, 1042, the defendants also argued the nature of the acts inflicted on the victim were not comparable to the nature of the acts involved in other reported torture cases. The appellate court explained: "The emphasis is rightfully placed on the perpetrator, one who for revenge or other prohibited purpose, inflicts great bodily injury on the victim and intends to cause the victim severe pain and suffering. That other victims of torture may have suffered more than the victim in this

10

case sheds no light on the sufficiency of the evidence of defendants' intent to cause [the victim] severe pain and suffering." (*Id*. at pp. 1042-1043.)

Here, the circumstances of the offense involved defendant, over a period of several days, repeatedly beating Jane with a belt, whipping her with a cord, punching her, kicking her, painfully pinching her, attempting to strangle her with the cord, and threatening to kill her. Jane's injuries included pain, significant bruising on her back, shoulders, face, and legs, and a broken pinky. All of these factors are sufficient evidence of torture exceeding "common" domestic violence.

Defendant further argues that he did not intend to cause Jane cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or any sadistic reason. He reasons that if what happened to Jane and the prosecutor's revenge or persuasion theory qualifies as torture then "any instance of domestic violence caused by accusations of infidelity in which great bodily injury was inflicted could be converted to a torture case."

The intent required for section 206 torture differs from the intent required for murder by torture because section 206 torture "does not require that the defendant act with premeditation or deliberation or that the defendant have an intent to inflict prolonged pain." (*People v. Pre*, *supra*, 117 Cal.App.4th at p. 420.) Instead, section 206 torture simply requires an intent to cause cruel or extreme pain for revenge, extortion, persuasion, or sadism. Such intent can be established by the circumstances of the offense. (*People v. Hale*, *supra*, 75 Cal.App.4th at p. 106.)

11

Here, defendant's prolonged attack on Jane was prompted by his irrational jealousy, either to seek revenge for her having cheated on him or to stop her from cheating on him in the future. (*People v. Burton* (2006) 143 Cal.App.4th 447, 453) It was not comparable to a sudden explosion of gang violence or a spontaneous act of "animal fury," which may not necessarily be considered to be torture. (*People v. Mincey* (1992) 2 Cal.4th 408, 432; see also *People v. Davenport* (1985) 41 Cal.3d 247, 268, superseded by statute on another ground as stated in *People v. Crittenden* (1994) 9 Cal.4th 83, 140, & fn. 14; *People v. Walkey* (1986) 177 Cal.App.3d 268, 275-276.) We reject defendant's effort to characterize his conduct as not sadistic and therefore not torture. Defendant's jealous rage certainly caused him to act from motives of revenge or persuasion.

The evidence further shows defendant intended to inflict cruel or extreme pain on Jane. He did not simply slap her. He subjected her to prolonged physical and emotional abuse over the course of several days. He beat Jane with a belt twice, whipped her with a cord on three separate occasions, painfully pinched her legs several times, and punched her in the chest and jaw. He also tried to strangle Jane with the cord, kicked her, and hit her with a shoe. Defendant continued his onslaught for several days until Jane "confessed" to wanting to be with the man she met at the grocery store. Under these circumstances, the severity of Jane's injuries and the multiple beatings over the course of several days substantially supported an inference that defendant intended to torture her. (*People v. Mincey*, *supra*, 2 Cal.4th at pp. 432-433; *People v. Crittenden* (1994) 9 Cal.4th 83, 141; *People v. Pre*, *supra*, 117 Cal.App.4th at pp. 420-421.)

The jury could reasonably determine from the totality of the evidence that defendant intended to inflict cruel or extreme pain and suffering on Jane. Accordingly, we conclude there was sufficient evidence for the jury to find defendant guilty beyond a reasonable doubt of committing torture in violation of section 206.

## III

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ

P. J.

We concur:

RICHLI

J.

MILLER

J.