Filed 5/10/16  P. v. Watson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yuba)

----

|  |  |
|---|---|
| THE PEOPLE, | C078754 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF1420) |
| v. | |
| ROBBIE GENE WATSON, JR., | |
| Defendant and Appellant. | |

Defendant Robbie Gene Watson, Jr., repeatedly beat his wife following a phone call to his mother regarding a visit to his lawyer about a prior incident of domestic violence his wife had reported.  A jury found him guilty of 10 crimes, including torture and dissuading a witness.  On appeal, defendant raises four contentions relating to his torture conviction, his dissuading a witness conviction, and his sentence.  Disagreeing with these contentions, we affirm with directions to the trial court to correct the abstract of judgment to reflect the court's properly-imposed sentence.

1

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant, his wife, and their two children lived together in a house in Marysville. On Friday, January 10, 2014, defendant was in the living room talking on the cordless phone with his mother about a visit to his lawyer about a prior incident of domestic violence his wife had reported for which he had a court appearance on Monday. Defendant, who was drunk, was "yelling . . . about what had happened at the lawyer's office." Defendant told his mother, "if we didn't fix this, that he was going to kill us."

Defendant hung up the phone and threw it at his wife's chest. He then grabbed her by the throat, but he let go when his wife hit him over the head with an ashtray. She ran into the kitchen. Defendant followed her and punched her in the face four or five times, and when she fell to the ground, he told her not to get up. She tried to get up, so defendant shoved her into the refrigerator and, taking hold of her hair, slammed her head into the floor. She grabbed a spatula and hit defendant, causing him to let go of her momentarily and call his mother. Defendant got hold of his wife again and told his mother he was "going to kill us." His wife begged in the background for his mother to call the police.

The children started screaming in their bedroom, so defendant let go of his wife, and she went to calm them down. His wife started rocking their two-year-old daughter in her arms, and then defendant came inside the bedroom and hit his wife on the head, knocking her on to the bed. She grabbed the phone and called 911, but defendant hung up the phone and continued to punch his wife in the face. Defendant momentarily stopped when his friend got to the house and grabbed defendant's arm. Defendant told his friend that his wife had already called police. Defendant then started beating his wife again telling her, " 'You're dead.' "

Defendant's friend took the daughter away, and defendant went outside to the front porch. His wife locked the front door. Defendant kicked in the door and came inside with a posthole digger. His wife knocked it loose from his hands, but then

2

defendant grabbed her and threw her to the ground on the front porch and started hitting her with the posthole digger. Defendant then grabbed an aluminum pole, held it like a bat, and hit her many times with it in the head and eyes. He stopped and ran into the house when police arrived. Police arrested defendant and took him into custody.

While in jail, defendant wrote his wife an eight-page letter that a friend hand-delivered to the house. In the letter, defendant wrote the following: "Please find it in your heart to forgive me and give me one last chance." "I'm ready to do what[]ever it takes to spend my life with you baby." "I said it baby no matter how bad things got we told each other that we would never leave each other that we could always be together . . . ." "What I'm asking is give me some time to fi[ght] this . . . ." "What I'm trying to say is that I think we should work past this we should learn f[ro]m this . . . and put all of [our] past in the past and look to the future . . . ." "I know that I have hurt you really bad this time, but baby you have hurt me to[o] . . . we have hurt each other for qui[te] some time. I do things you don't like and you do things I don't like . . . ." "Baby please just one last chance I will make this right."

His wife's take on the letter was that he was asking her "[t]o forgive him and start over, give him another chance," "[s]ame things that he had told [her] in the past after all these other incidents . . . ." This was "his way of trying to stop [her] from coming here," i.e., to court. In these other incidents, he would "beg [her] to give him another chance, tell [her] that it wasn't all his fault, it was [hers] too. He told [her she] needed to fix it."

DISCUSSION

I

*The Torture Statute Is Not Unconstitutionally Vague*

A defendant is guilty of torture if he inflicts great bodily injury upon the person of another "with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (Pen. Code, § 206.) Defendant contends the definition of torture in our Penal Code is unconstitutionally

3

vague, based on *Johnson v. United States* (2015) 576 U.S. ___ [192 L.Ed.2d 569] (*Johnson*).

In *Johnson*, the Court held that the residual clause of a federal recidivist statute, which defined a violent felony prior conviction as one that " 'otherwise involves conduct that presents a serious potential risk of physical injury to another' " was unconstitutionally vague for two reasons. (*Johnson*, *supra*, 576 U.S. at p. ___ [192 L.Ed.2d at pp. 576-578].) One, "the residual clause leaves grave uncertainty about how to estimate the risk posed by a crime." (*Id*. at p. ___ [192 L.Ed.2d at p. 578].) Two, "the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony." (*Id*. at p. ___ [192 L.Ed.2d at p. 579].) Specifically, the residual clause "requires application of the 'serious potential risk' standard to an idealized ordinary case of the crime" and "this abstract inquiry offers significantly less predictability than one '[t]hat deals with the actual, not with an imaginary condition other than the facts.' " (*Id*. at p. ___ [192 L.Ed.2d at p. 583].)

In contrast, California's torture statute does not suffer from the same problems as the residual clause in *Johnson* because each of the terms used in the torture statute has an established, readily understood meaning. We explain below.

As to the phrase "cruel or extreme pain and suffering" "[i]n [Penal Code] section 206, the word 'cruel' modifies the phrase 'pain and suffering.' In at least two other cases, courts have held that 'cruel pain' is the equivalent to 'extreme' or 'severe' pain. [Citations.] This definition comports with the common dictionary definition of 'cruel' (see Webster's New Internat. Dict. (3d ed. 1965) p. 546 [as an adjective, 'cruel' means 'extreme' or 'severe'])." (*People v. Aguilar* (1997) 58 Cal.App.4th 1196, 1202, fn. omitted.)

And as to the phrase, "for the purpose of revenge, extortion, persuasion, or for any sadistic purpose," we reject defendant's vagueness challenges to these terms as well. Defendant contends, "[h]ow can jurors rationally decide the purpose of the assaultive

4

conduct where the possible 'purposes' of 'revenge,' 'extortion,' 'persuasion' or 'sadism' appear so broad that they could encompass virtually any assaultive conduct?"  But they do not encompass virtually any assaultive conduct.  As to "sadistic purpose," the California Supreme Court has held it is "a term in common usage, having a relatively precise meaning, that is, the infliction of pain on another person for the purpose of experiencing pleasure." (*People v. Raley* (1992) 2 Cal.4th 870, 901.)  As to the remaining terms, the crime of torture focuses on the perpetrator's mental state and not the assaultive conduct itself.  ( *People v. Hale* (1999) 75 Cal.App.4th 94, 108.)  "In this respect, revenge, extortion, and persuasion are self-explanatory." (*People v. Massie* (2006) 142 Cal.App.4th 365, 371.)

In contrast, the problem in *Johnson* is that the residual clause gave no real guidance on how to determine what qualifies as serious potential risk of physical injury to another.  That is, what level of risk qualifies as "serious," and how do we determine whether a crime poses such a risk?  No such problem arises with the terms in Penal Code section 206, which are all commonly understood as described above.  Thus, the torture statute is not void for vagueness in violation of *Johnson*.

II

*There Was Sufficient Evidence Defendant Was Guilty Of Torture*

Defendant contends the People presented insufficient evidence he was guilty of torture because "[t]he evidence here demonstrated a violent, prolonged and thoughtless assault.  But the evidence simply did not permit a rational juror to conclude beyond a reasonable doubt that the prosecution proved a forbidden purpose behind acts which had no purpose."  Defendant is wrong because there was sufficient evidence that defendant's prolonged beating of his wife was motivated by "the intent to cause cruel or extreme pain and suffering for the purpose of *revenge*, extortion, persuasion, or for any sadistic purpose."  (Pen. Code, § 206, italics added.)

5

Here, the prosecutor argued and the evidence showed that the purpose of the beating was revenge. Specifically, the wife had reported to police a previous instance of domestic abuse for which defendant had a court appearance on Monday and for which he had gone to see his attorney earlier in the day. Just before he threw the phone at his wife, defendant had been on the telephone with his mother "yelling . . . about what had happened at the lawyer's office." He said, "if we didn't fix this, that he was going to kill us." From this evidence, the prosecutor argued that with the prolonged beating, defendant "intend[ed] to cause cruel or extreme pain and suffering for the purpose of revenge." The prosecutor then explained that "this whole thing started as a result of a phone conversation he had regarding him having to come to court on Monday for thumping her before. . . . And he is upset with having to go to that court. He throws the phone at her . . . [¶] . . . [¶] and then the beat down starts." This evidence was sufficient to establish the ensuing prolonged beating was revenge for the wife's reporting an earlier incident of domestic violence.

### III

*There Was Sufficient Evidence Defendant Was Guilty Of Intimidating A Witness*

Defendant contends there was insufficient evidence he intimated a witness (his wife) because the letter, which formed part of the basis for the intimidation charged, "has nothing to do with court, and everything to do with love." Defendant argues that "in the letter he simply sets forth a desire for forgiveness and a vow to lead a better, sober, less violent life. That desire has nothing to do, on its face or by way of implication, with intimidating a potential witness against him." We disagree.

As defendant was charged and the jury was instructed, the crime of intimidating a witness included "knowingly and maliciously . . . attempt[ing] to prevent or dissuade any victim . . . from, A, attending or giving testimony at any trial, proceeding or inquiry authorized by law, B, causing a complaint, indictment, information to be sought and prosecuted and from assisting in the prosecution thereof." Contrary to defendant's

6

contention, there was sufficient evidence based on the content of the letter *and the wife's testimony* that he knowingly and maliciously attempted to dissuade his wife from testifying and from assisting in his prosecution.

The eight-page handwritten letter that was introduced into evidence included the following: "I'm ready to do what[]ever it takes to spend my life with you baby." "I said it baby no matter how bad things got we told each other that we would never leave each other that we could always be together . . . ." "What I'm asking is give me some time to fi[ght] this . . . ." "What I'm trying to say is that I think we should work past this we should learn f[ro]m this . . . and put all of [our] past in the past and look to the future . . . ." "I know that I have hurt you really bad this time, but baby you have hurt me to[o] . . . we have hurt each other for qui[te] some time. I do things you don't like and you do things I don't like . . . ." "Baby please just one last chance I will make this right."

This letter could be read in two ways. One, defendant was simply trying to ask his wife to forgive him so they could start a new life together. Or two, his wife was partly to blame for his legal troubles, he was not going to allow his wife to leave him, and he would do whatever it took to be with her. In keeping with the second reading, defendant's wife testified that as she read the letter, he was asking her "[t]o forgive him and start over, give him another chance." "Same things he had told [her] in the past after all these other incidents . . . ." That was "his way of trying to stop [her] from coming here," i.e., to court. He would "beg [her] to give him another chance, tell [her] that it wasn't all his fault, it was [hers] too. He told [her she] needed to fix it."

Given this testimony and parts of the letter that we have just recounted that fit this mold of dissuading her from participating in defendant's prosecution, the letter could be read in a way to show intent to dissuade his wife from testifying. There was sufficient evidence to support the jury's verdict.

7

## IV

*The Abstract Of Judgment Must Be Corrected*

*To Reflect A Life Term For Torture*

Defendant contends the court should have given him a life term for his torture conviction, instead of seven years to life.  The problem here lies not in the court's pronouncement of sentence but in the abstract of judgment.

The court imposed as defendant's sentence for torture a sentence of "life."  This was correct, as "[t]orture is punishable by imprisonment in the state prison for a term of life."  (Pen. Code, § 206.1.)  The abstract, however, shows an "X" on box 6c, which is filled in as "7 years to Life on count[]1."  The box that should have an "X" by it is box 5, which states "LIFE WITH THE POSSIBILITY OF PAROLE on counts __."

## DISPOSITION

The judgment is affirmed.  The trial court is directed to correct the abstract of judgment by:  (1) deleting the "X" on box 6c; and (2) placing an "X" on box 5 stating, "LIFE WITH THE POSSIBILITY OF PAROLE on count[] 1."  The trial court is further directed to forward a copy of the corrected abstract to the Department of Corrections and Rehabilitation.


/s/
Robie, Acting P. J.

We concur:


/s/
Mauro, J.


/s/
Duarte, J.

8