Filed: 1/22/15  P. v. Stansell CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JACQUORIE CHARLES STANSELL et al.,<br><br>        Defendants and Appellants. | B252639<br><br>(Los Angeles County<br>Super. Ct. No. MA056070) |

APPEALS from judgments of the Superior Court of Los Angeles County, Lisa Mangay Chung, Judge.  Reversed in part, modified in part, and affirmed in part.

Maxine Weksler, under appointment by the Court of Appeal, for Defendant and Appellant Jacquorie Charles Stansell.

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant Nailah White.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson, Erika D. Jackson and Zee Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

A jury convicted defendants, Jacquorie Charles Stansell and Nailah White, of: child abuse (Pen. Code, § 273a, subd. (a))**1**; assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)); battery with serious bodily injury (§ 243, subd. (d)); mayhem (§ 203); and torture (§ 206). The jury further found that with respect to the child abuse and aggravated assault counts, defendants personally inflicted great bodily injury on the victim. (§ 12022.7, subd. (a).) Defendants were each sentenced to life with the possibility of parole. We hold battery with serious bodily injury is a lesser included offense of simple mayhem. Therefore, we reverse defendants' battery with serious bodily injury convictions. We modify the judgments with respect to assessments. We affirm the judgments in all other respects.

## II. THE EVIDENCE

### A. The Prosecution's Case

#### 1. Overview

Ms. White had two children, A. and Lailah. A. is the victim in this case. At the time of the events leading to defendants' convictions, A. was seven and Lailah was six. Mr. Stansell was Ms. White's live-in boyfriend. The two adults and two children lived in a Palmdale apartment complex. Mr. Stansell had a history of whipping, slapping and punching A.

Shortly before 5:30 p.m. on April 29, 2012, Mr. Stansell decided to take the children to the apartment complex's swimming pool. Mr. Stansell told A. to put on his

---

**1**      Further statutory references are to the Penal Code except where otherwise noted.

swimming trunks. A. did not want to go to the pool because it was cold outside and he did not know how to swim. According to witnesses, April 29, 2012 was a windy, cool day. The temperature was around 60 degrees. The pool water was very cold. When A. started to cry, Mr. Stansell slapped him across the face and told him to stop.

After arriving at the pool, over the course of the ensuing two hours, Mr. Stansell verbally and physically abused A. This ongoing abuse caused A. to nearly drown and, ultimately, to lose consciousness. Ms. White both participated in the abusive conduct and failed to protect A. Mr. Stansell ostensibly attempted to teach A. to swim in a manner described by witnesses as "excessively rough." Mr. Stansell threw A. into the pool. Mr. Stansell forced A. to remain in water eight feet deep. Mr. Stansell knew A. could not swim. A. could barely keep his head above water, was swallowing water and was choking. Mr. Stansell slapped A. in the back of the head with an open hand. Mr. Stansell held A. under water with one hand. While doing so, Mr. Stansell punched A. with the other hand. Mr. Stansell punched A. at least three times with a closed fist. Mr. Stansell used profanity toward A. Mr. Stansell screamed and yelled at A. Mr. Stansell called A. stupid and "dumb ass." Mr. Stansell left the child alone in the pool while sitting in the Jacuzzi. Mr. Stansell left A. floating face down in the water for 30 seconds. Mr. Stansell threw, shoved and dragged A. out of the pool onto concrete. Mr. Stansell stood over A. and demanded that the youngster get up. Mr. Stansell demanded that A. "man up." Mr. Stansell threatened A. saying, "You better get up or I'm going to fuck you up." Mr. Stansell stood A. upright then backed away even though the child was visibly dizzy and stumbling. Mr. Stansell watched as A. fell face first onto the concrete.

Firefighters found A. lying on the apartment floor unconscious. He was shivering and hyperventilating. He was suffering from hypothermia. He had a large hematoma on his forehead, chipped teeth, a swollen lip and was bleeding from his mouth. A. showed signs of brain injury due to oxygen deprivation. A. was evacuated by helicopter to Children's Hospital.

## 2. The Six Eyewitnesses

3

## a. Andrew Proctor

Mr. Proctor was at the apartment complex pool for 30 to 40 minutes on the evening in question. Defendants, A. and Lailah were also there. When Mr. Proctor first arrived at the pool, defendants and A. were in the eight-foot deep end. Mr. Proctor testified, "[Defendants] were teaching [A.] how to swim in an excessively rough way." Mr. Proctor explained what he meant by "excessively rough": "I saw the female defendant, the mother, she wouldn't let him out of the pool. The father, he was just - - he was verbally abusive. I did see him slap the boy in the back of the head. It was an open hand." Mr. Stansell called A. "stupid" and "dumb ass" and words to that effect. Mr. Proctor testified, "[Mr. Stansell was] just being cruel in the way he was speaking to [A.]." Defendants were verbally abusive toward A. throughout Mr. Proctor's observation of the events. Five minutes after arriving at the pool, Mr. Proctor started a spontaneous game of volleyball with Mr. Stansell. The two men were in the shallow end of the pool. The game lasted 20 to 30 minutes.

During that time, Ms. White was in the deep end with A. Ms. White was holding onto the pool's edge. A. tried to exit the pool approximately 10 times. Each time, Ms. White prevented A. from reaching the pool's edge or its shallow end. She pushed A. back into the middle of the deep end. It was apparent to Mr. Proctor that A. did not know how to swim. A. could barely keep his head above the water. He was struggling to stay above the water. He was also swallowing water and choking. A. appeared to be cold and very tired.

During the 30 to 40 minutes he was present, Mr. Proctor saw A. go under the water approximately 10 times. Mr. Proctor testified: "[A.] was having trouble staying afloat. It was clear he could not swim." In Mr. Proctor's view, "[A.] was not having fun." After 20 to 30 minutes, Mr. Proctor got out of the pool because he was cold. He went into the Jacuzzi, as did defendants. Defendants left A. in the pool Defendants sat

4

side by side in the Jacuzzi, talking to each other and with Mr. Proctor for about 10 minutes.

Defendants were facing a parking lot; the pool was to their left. While Mr. Proctor and defendants were in the Jacuzzi, Mr. Proctor saw A. crawl out of the pool on his hands and knees. A. crawled slowly up the stairs in the shallow end of the pool. A. was crying. He lay on the concrete three feet from the pool's edge. He was laying face down on the concrete, choking and coughing. His arms and legs were outstretched. Mr. Proctor described A. as "exhausted." Mr. Stansell called A., who was lying on the ground, a "dumb ass." Mr. Proctor left the pool area. Later, after viewing a television news report of the incident, Mr. Proctor went to the Palmdale sheriff's station and reported what he had observed.

A. was told by defendants he had to learn how to swim. Defendants were, in Mr. Proctor's words, "[V]ery motivated to teach him how to swim." Mr. Proctor testified, "I remember [Mr. Stansell] yelling at [A.] to try and keep his hands and legs above the water because he kept on going underneath the water." Mr. Proctor believed that defendants wanted A. to stay above the water. Mr. Proctor did not think A. was in any immediate danger. Mr. Proctor testified, "When I left [the pool], I believed that [A.] was simply overreacting."

b. Esteban Rodriguez

Mr. Rodriguez was delivering furniture to the apartment complex. He heard a noise that caused him to look toward the pool. The pool was about 10 feet away. Mr. Rodriguez saw only two people in the pool—Mr. Stansell and A. Ms. White and Lailah were outside the pool. Ms. White was lying on a lounge chair. Mr. Stansell was speaking in a "very loud," upset voice. Mr. Stansell was reprimanding A. Mr. Stansell said to A. in a "rough" voice, "What are you thinking." Mr. Rodriguez saw Mr. Stansell holding A. underwater with one hand. Mr. Stansell was punching A. with his other hand. Mr. Rodriguez saw Mr. Stansell punch A. with a closed fist at least three times. Mr.

5

Rodriguez was certain he saw the punches. After being punched, A. remained under the water for 20 to 30 seconds. Mr. Rodriguez testified: "[Mr. Stansell] was upset of the kid and he was kind of, like, reprimanding saying 'What are you thinking?' And I saw at least three punches, one hand holding him and stay under the water and the other one hitting him. And that's what I saw immediately." Mr. Stansell then grabbed A. Mr. Stansell pushed and shoved A. out of the water onto concrete. Mr. Stansell was upset. A. landed "pretty hard" on the concrete. He was on his hands and knees, almost lying down. A. vomited water. Mr. Rodriguez testified, "I [was] worried about the kid's safety . . . ." Mr. Rodriguez observed A. off and on for 20 or 30 minutes. Some time later, Mr. Rodriguez saw Mr. Stansell carrying A. into the apartment building. Mr. Rodriguez never saw anyone in a Jacuzzi. He did not remember seeing a Jacuzzi. Mr. Rodriguez testified what he observed was not a swimming lesson. In Mr. Rodriguez's opinion: "[It was] somebody being upset of a person and punching him. It was not swim lessons."

### c. Mario Escobar

Mr. Escobar had accompanied Mr. Rodriguez to the apartment complex. The two men were dropping off some mattresses for Mr. Escobar's mother-in-law. They made four or five trips from their Suburban to the apartment complex and back. Mr. Rodriguez told Mr. Escobar something was going on in the pool, somebody was being hit. Mr. Escobar looked towards the pool and saw A. floating face down in the pool. A. was floating with his arms out and his head and legs underwater. A. was not moving. Mr. Stansell was nearby. Mr. Escobar watched A. float face down for 30 seconds. At first, Mr. Escobar thought A. was just playing. Mr. Escobar saw Mr. Stansell walk away. Mr. Stansell returned 20 to 30 seconds later. Mr. Stansell went into the pool, picked A. up, and threw the youngster toward the shallow end. Mr. Stansell picked A. up a second time and threw the child again. Mr. Escobar described Mr. Stansell's actions: "[He] grabbed [A.] with both hands and just kind of threw him into the shallow water and then grabbed him again and then threw him into the thing and he finally got him out of the pool." Mr.

6

Stansell dragged A. out of the pool. Mr. Escobar testified: "[A]fter like three throws, [Mr. Stansell] got [A.] out of the pool and then . . . the kid was on the ground. He was laying there. And then I just - - I guess that's when I realized something just wasn't right . . . ." A. was lying on the concrete coughing and was moving very little. Mr. Stansell walked away. Thirty seconds later Mr. Stansell returned.

Mr. Stansell and Ms. White yelled at A. to get up. They told A., "Come on you" and "Get up." Mr. Stansell told A., "[M]an up." Mr. Stansell and Ms. White were speaking to A. in an aggressive manner. They were using profanity towards A. Mr. Stansell said, "[Y]ou better get up or I'm going to fuck you up." Mr. Stansell attempted to stand A. upright. A. stood briefly. He looked dizzy, dazed and woozy. A. was stumbling. Mr. Stansell and Ms. White backed away. A. fell face forward to the concrete. He did not get up again. Mr. Stansell was standing six or seven feet away when A. fell. Mr. Stansell was facing A. Ms. White was also present. Mr. Escobar did not see either parent take any action. Mr. Escobar could hear Lailah crying. After A. fell face first to the concrete, Mr. Stansell and Ms. White left him there. Mr. Escobar described Mr. Stansell's and Ms. White's behavior toward A. as "aggressive." Mr. Escobar did not see anyone perform cardiopulmonary resuscitation on A. He did not hear anyone call for emergency assistance.

On cross-examination, Mr. Escobar testified Ms. White was present when A. fell face first to the concrete. But Mr. Escobar did not know exactly where she was or what she was doing. Mr. Escobar testified: "She was there. I just don't know what she was doing or where exactly she was, but she was there. At some point, they were both pretty much in front of the child."


d. Jose Martinez


Mr. Martinez was the apartment complex's on-site maintenance manager. Mr. Martinez saw A. kneeling down outside the pool. A.'s arms were on the cement. A. was

7

vomiting water.  A. looked tired.  He looked like he wanted to cry.  Ms. White was in the Jacuzzi.  Mr. Stansell was standing outside the Jacuzzi.  Mr. Stansell grabbed A. by one arm and dragged the youngster closer to the Jacuzzi.  The last time Mr. Martinez saw A., Mr. Stansell was carrying the youngster.  It looked like A. was unconscious.

### e.  Marvin V.

Ten-year-old Marvin was also swimming in the pool that day.  Marvin testified A. did not want to go into the pool.  A. looked "a little bit scared."  Then Mr. Stansell threw A. into the pool.  Mr. Stansell and Ms. White were throwing A., who could not swim, in the pool.  Marvin saw A. "drowning."  Marvin testified that drowning meant a person could not breathe underwater.  A. could not breathe because he was under the water.  A. struggled to get out of the pool by himself.  He lay down on the cement.  Mr. Stansell and Ms. White were in the Jacuzzi.  They were talking and laughing.  When asked how often A. was under the water, Marvin testified, "Probably a lot."

### f.  Nelson Peraza

Mr. Peraza watched the events in the pool unfold from a neighbor's front porch. Mr. Peraza testified Mr. Stansell and Ms. White were forcing A. to swim.  Ms. White was in the pool for about five minutes but then got out.  Ten minutes later, Mr. Stansell also got out, leaving A. alone in the pool.  A. was under the water for "quite a minute," in Mr. Peraza's words.  Mr. Stansell got out of the Jacuzzi and went back to the pool.  Mr. Stansell grabbed A. by one arm and pulled the youngster out of the pool onto the cement. Mr. Peraza testified, "He didn't care any more or nothing, just pulled him."  Mr. Peraza further testified:  "He pulled him out, dragged him onto the concrete.  So he didn't pick him up at all."  A. was on his knees on the concrete, crying and coughing up "a lot" of water three to four feet from the Jacuzzi.  Mr. Stansell and Ms. White were in the Jacuzzi. They left A. there on the concrete.  At one point Mr. Stansell brought A. over to the hot

8

tub and placed the youngster on Ms. White's lap. A. remained there for five minutes. Mr. Peraza described Mr. Stansell as "upset." Mr. Peraza said Mr. Stansell spoke to A. in a rough tone of voice about wanting to come to the pool but not knowing how to swim. Mr. Stansell and Ms. White began to walk away from the pool area. But A. was paralyzed. He could not move or walk. Mr. Stansell went back for A. Mr. Stansell carried A. like a sack and walked into the apartment building.

### 3.   The Emergency Responders

Mr. Stansell telephoned an emergency operator. When firefighters arrived, A. was lying on the floor of the family's apartment shivering and hyperventilating. He was unresponsive. He had a hematoma on his forehead with significant swelling. Firefighter Ryan Golphenee testified, "[A] hematoma is the swelling resulting from . . . some kind of impact." A.'s two upper front teeth were chipped and his mouth was bleeding. He had cuts on his lips and his gums. His lip was swollen. He showed signs of brain injury due to oxygen deprivation. His pupils were not responsive. He had enough water in his system to cause him to pass out. A. was treated by paramedics. He was subsequently transported by helicopter to Children's Hospital. When firefighter paramedic Lyle Koegler arrived at the apartment complex, he was approached by two men. The men said they had seen a father beating up a kid. Mr. Koegler reported the comments to his superior on the scene.

Ms. White told a firefighter, Mr. Golphenee, that Mr. Stansell and she had exited the pool area and gone into their apartment for a few minutes; when they returned, A. was lying unconscious on the ground next to the pool. Upon further questioning, Ms. White changed her story. She told Mr. Golphenee she was in the Jacuzzi with Mr. Stansell and had looked away from the pool for a moment; when she looked back, A. was unconscious. Mr. Golphenee attempted to get as much information as he could about how A. was injured. He directed questions to both Ms. White and Mr. Stansell. But Mr. Stansell did not respond. Mr. Golphenee testified, "[Mr. Stansell] just stood there and

9

watched . . . ." Ms. White was not crying. Mr. Golphenee described her demeanor as "task oriented." He explained: "She appeared to be . . . task oriented. Like really focused on what was going on . . . ."

Mr. Stansell was initially questioned by Captain Lawrence Gorrindo concerning how A. was injured. Mr. Stansell was then questioned by David Ball, a firefighter paramedic. Mr. Ball's notes of the conversation on the patient care report form state, "'Father states that patient crawls out of the pool, stood up and fell striking head." Captain Gorrindo wrote on the patient care report form , "Conflicting stories, possible abuse."

Ms. White accompanied A. to the hospital. Brett McGillivray, a social worker, spoke with Ms. White at the hospital in an attempt to determine how A. was injured. Ms. White was evasive and provided very little information. She became dismissive and waived off the questions. She asked why doctors could not treat A. just by looking at him. Mr. McGillivray asked Ms. White to be more specific in order to help medical personnel treat A. Ms. White did not respond to Mr. McGillivray's request. Ms. White did tell Mr. McGillivray they had been swimming and it was cold. And A. fell by the side of the pool. Ms. White said she was a lifeguard and had performed "mouth-to-mouth" on A. even though he was awake at the time.

Deputy Erica Martinez questioned Mr. Stansell at the scene. Mr. Stansell said he was trying to teach A. how to swim. Mr. Stansell admitted tossing A. five to ten feet into the pool. Mr. Stansell said, "I just . . . threw him, and like, 'swim.'" Mr. Stansell admitted he became angry and frustrated. A. kept putting his head under the water and opening his mouth. Mr. Stansell denied remembering hitting A. He said, "I just slapped his face with my finger tips" on the cheek. Mr. Stansell told Deputy Martinez: "I was just trying to teach [A.] how to swim. And, like I said, my wife took over because I was getting too angry . . . Like I said, I slapped him in the face one time. Then I was throwing him around the pool. Then, after he got out, after he got out, I got back in. Then I pulled him back in, I threw him back in the pool. But, then he started to sink. And I, I just jumped in after him. I pulled him up, and like I said, after that I got out of

the pool. And he, he was shaking, and I sat him down and I tried to put him in the Jacuzzi. And he, he, I was like, 'Are you alright, son?' And then I took him out and wrapped him in a towel. And I sat him in the [chair]. He couldn't sit up. And then I started, I tried to see if he could walk. And when I sat him down and tried to let him walk, he just . . . ." Mr. Stansell was arrested. Deputies noted that an open package of uncooked spaghetti was the only food in the family's apartment. Mr. Stansell admitted to Deputy Martinez, "All we had was spaghetti."

### 4. The Children

Deputy Susan Velazquez interviewed A. at his school several days after the incident. A. could not remember what had happened. But he knew that his teeth got chipped that day at the pool. A. denied being punched or hit with a belt by Mr. Stansell. Deputy Velasquez interviewed A. multiple times thereafter. A.'s testimony at trial was consistent with those interviews.

A. testified at trial that he did not want to go swimming that day. But Mr. Stansell said, "Get your swimming trunks on." A. started to cry. Mr. Stansell slapped A. in the face. The slap in the face hurt A. Mr. Stansell then ordered A. to stop crying. When they reached the pool, Mr. Stansell threw A. into the water and then jumped into the deep end. Mr. Stansell told A. to swim to the deep end. A. testified, "I stayed on the side that wasn't deep." A. recalled swallowing "[a] little bit" of water. He did not remember what happened next. The next thing he remembered was being in a helicopter.

This was not the first time A. was struck by Mr. Stansell. A. testified, "He used to give me whoopings." A. would be ordered by Mr. Stansell to stand up and bend down. Mr. Stansell hit A. with a belt "[a] lot" and it hurt. Also, A. testified, "He used to sock me in the stomach." Being "socked" in the stomach hurt and A. would cry. A. testified he would lose his breath a "little bit" when he was struck in the stomach. Similarly, A. characterized being struck in the stomach as something that occurred only "[a] little bit" rather than "a lot."

11

As noted above, emergency personnel reported A. had two chipped front teeth. At the time of trial, A. had lasting dental issues. Anthony W. is A.'s biological father. Anthony testified, "[A.] constantly complained of pain in the front top of his mouth." A.'s front adult tooth had been fractured above the gum line; the entire right front tooth was severed from the portion above it. The tooth had been repaired. But the tooth had some movement. The dentist told Anthony that A. should not bite down on the tooth when eating.

Lailah testified she went to the pool with Mr. Stansell, Ms. White and A. Mr. Stansell told A. to get in the pool. But A. did not want to get in the pool. Mr. Stansell threw A. into the shallow end of the pool. Lailah saw A. under the water. He could not swim. Lailah saw A. swallowing water. Ms. White twice told A. to stop swallowing water. A. was coughing. After a while, A. got out of the pool and lay on the ground. Mr. Stansell and Ms. White were in the Jacuzzi. Ms. White told Lailah to go tell A. to get up. But A. would not get up. Mr. Stansell put A. back in the pool, into the deep end. Ms. White also got into the pool. Then Ms. White took A. out of the pool and put him in the Jacuzzi. Lailah testified the family returned to their apartment, "[A]fter my mom had seen [A.] was shocked." A. coughed out blood on Mr. Stansell.


5. Defendants' Criminal Records


Mr. Stansell admitted he had a prior conviction for misdemeanor petty theft. The parties stipulated that Ms. White had a prior misdemeanor conviction of abuse, neglect and child endangerment. The crime occurred on or about October 16, 2007, in Las Vegas, Nevada. The victim was Ms. White's daughter Lailah. Ms. White had also been convicted of assault by means of force likely to produce great bodily injury, a felony. The crime occurred on or about March 30, 2010, in Los Angeles County. The victim was Ms. White's mother, Mayisha Akbar. At that time, Ms. White was dating Mr. Stansell. Ms. White, Lailah and A. had been living in Ms. Akbar's home. The children were

12

present during the aggravated assault.  They were subsequently taken into protective custody.  Mr. Stansell testified at trial that Ms. Akbar had attacked Ms. White.  Mr. Stansell testified Ms. White was simply defending herself.

## B.  The Defense Case

Mr. Stansell testified in his own defense.  He admitted he generally cursed at the two children.  He admitted he had whipped the two children with a belt when they misbehaved.  Mr. Stansell started whipping them when Lailah was five and A. was six.  Mr. Stansell denied ever punching A. in the stomach.  Mr. Stansell said, "we used to play fight."  He denied ever slapping Lailah.

With respect to the events at the pool, Mr. Stansell denied that he was angry.  At first, while testifying, Mr. Stansell denied throwing A. into the pool.  Mr. Stansell admitted, however, "I just, like, tossed him in a little bit."  Mr. Stansell subsequently admitted throwing A. into the pool.  This occurred after A. was lying on the concrete after getting out of the pool.  A. then started to sink.  Mr. Stansell denied slapping A. on the day in question.  Mr. Stansell conceded, however, that while teaching A. to swim:  "I had slightly hit [A.] in the face with the tip of my fingers.  I slapped [him]—not [a cross] slap, but playing around."  A. was whining during the swimming lesson, but he was not crying.  A. said he was tired and cold.  Mr. Stansell testified:  "Most of the time he was underwater, he was trying to swim.  He was swimming underwater."  In terms of swallowing water, Mr. Stansell testified, "And as he would come up, I guess -- I guess he was swallowing water at those times."  Mr. Stansell subsequently heard a scream and then a thump.  Mr. Stansell turned around and saw A. on the ground.  A. was flat on his face. Ms. White performed cardiopulmonary resuscitation on A. "[as] a precaution" even though he was breathing.

Mr. Stansell originally told the emergency operator, "My son, I don't know, he like got shocked or something from being in the pool. . .'"  Mr. Stansell testified that A. was shocked from being in the pool.  Mr. Stansell testified, "His body was cold and

13

shaking." When asked by an emergency operator if A. was drowning, Mr. Stansell said, "'Yes, I guess so.'" When cross-examined, Mr. Stansell admitted knowing A. was drowning. Representatives of the media were present when Mr. Stansell was arrested. Someone put a camera in Mr. Stansell's face. Some of the neighbors were screaming, "I hope you die."

## III. DISCUSSION

### A. Torture

#### 1. State of the law

Pursuant to section 206, "Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture. [¶] The crime of torture does not require any proof that the victim suffered pain." The Court of Appeal has held: "As the statute states, torture has two elements: (1) a person inflicted great bodily injury upon the person of another, and (2) the person inflicting the injury did so with specific intent to cause cruel and extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (*People v. Baker* (2002) 98 Cal.App.4th 1217, 1223; accord, *People v. Massie* (2006) 142 Cal.App.4th 365, 370-371.) Pursuant to section 12022.7, subdivision (f), "'[G]reat bodily injury' means a significant or substantial physical injury." Whether a physical injury is significant or substantial is a question of fact for the trier of fact. (*People v. Cross* (2008) 45 Cal.4th 58, 64; *People v. Escobar* (1992) 3 Cal.4th 740, 750.) The damage need not be permanent, prolonged or protracted. (*People v. Cross, supra,* 45 Cal.4th at p. 64; *People v. Escobar, supra,* 3 Cal.4th at p. 750.) It is well established that abrasions, contusions, lacerations, bruising and soreness can constitute great bodily injury. (*People v. Cross, supra,* 45 Cal.4th at p. 64; *People v.*

14

*Escobar, supra,* 3 Cal.4th at p. 750; *People v. Pre* (2004) 117 Cal.App.4th 413, 420; *People v. Hale* (1999) 75 Cal.App.4th 94, 108; *People v. Jung* (1999) 71 Cal.App.4th 1036, 1042.) Our Supreme Court has further explained: "Proof that a victim's bodily injury is 'great' . . . is commonly established by evidence of the severity of the victim's physical injury, the resulting pain, or the medical care required to treat or repair the injury. [Citations.]" (*People v. Cross, supra,* 45 Cal.4th at p. 66; accord, *People v. Wade* (2012) 204 Cal.App.4th 1142, 1149-1150; *People v. Harvey* (1992) 7 Cal.App.4th 823, 827-828; 22 Cal.Jur.3d Criminal Law: Post-Trial Proceedings, § 236.) "Cruel" pain is equivalent to "extreme" or "severe" pain. (*People v. Jung, supra,* 71 Cal.App.4th at p. 1041; *People v. Aguilar* (1997) 58 Cal.App.4th 1196, 1202.)

Torture focuses upon the perpetrator's mental state, not the pain inflicted on the victim. (*People v. Massie, supra,* 142 Cal.App.4th at p. 371; *People v. Hale, supra,* 75 Cal.App.4th at p. 108.) The Court of Appeal has explained: "In this respect, revenge, extortion, and persuasion are self-explanatory. Sadistic purpose encompasses the common meaning, '"the infliction of pain on another person for the purpose of experiencing pleasure."' (*People v. Aguilar*[, *supra,*] 58 Cal.App.4th [at p.] 1203.) . . . [¶] Torture does not require that the defendant act with premeditation and deliberation, and it does not require that he [or she] intend to inflict prolonged pain. (*People v. Hale, supra,* 75 Cal.App.4th at p. 107.) Accordingly, the length of time over which the offense occurred is relevant but not necessarily determinative. (*Id.* at pp. 107-108.) Likewise, the severity of the wounds inflicted is relevant but not necessarily determinative. (*People v. Pre*[*, supra,*] 117 Cal.App.4th [at pp.] 420-421.) [¶] The intent with which a person acts is rarely susceptible of direct proof and usually must be inferred from facts and circumstances surrounding the offense. (§ 21, subd. (a); *People v. Pre, supra,* 117 Cal.App.4th at p. 420.)" (*People v. Massie, supra,* 142 Cal.App.4th at p. 371; accord, e.g., *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1426-1427, 1429-1431; *People v. Quintero* (2006) 135 Cal.App.4th 1152, 1162-1164; *People v. Jung, supra,* 71 Cal.App.4th at pp. 1042-1043.)

## 2. Mr. Stansell

### a. Sufficiency of the evidence

Mr. Stansell contends there was insufficient evidence of torture. Mr. Stansell reasons neither his conduct nor A.'s injuries are of the type contemplated by the torture statute. We disagree. We apply the well-established sufficiency-of-the-evidence standard of review: "[W]e must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. (*People v. Mincey* (1992) 2 Cal.4th 408, 432.) We neither reweigh the evidence nor reevaluate the credibility of witnesses. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. (*Ibid.*) If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. (*Ibid.*)" (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639; accord, *People v. Hajek* (2014) 58 Cal.4th 1144, 1260.)

Viewed in the light most favorable to the verdict, the jury could reasonably conclude Mr. Stansell inflicted great bodily injury on A. And the jurors could reasonably conclude Mr. Stansell did so with the specific intent to cause cruel or extreme pain or suffering to persuade or for a sadistic purpose. Mr. Stansell had a history of whipping, slapping and punching A. On the day in question, Mr. Stansell, along with Ms. White, physically and verbally abused A. for two hours. Mr. Stansell was cruel, aggressive and excessively rough. He yelled and screamed at A. He admittedly was upset and frustrated. Mr. Stansell acted in total disregard for A.'s physical safety. Mr. Stansell

16

threw A. into the pool. Mr. Stansell forced A. to attempt to swim in very cold water on a cool and windy day. Mr. Stansell threw A. into the pool knowing the youngster could not swim. Mr. Stansell prevented A. from leaving the pool despite the fact A. repeatedly went under the water and was in significant danger of drowning. When cross-examined, Mr. Stansell admitted knowing A. was drowning. Mr. Stansell forced A. to stay in the pool. Mr. Stansell did so despite the fact that the youngster was scared, cold and, eventually, exhausted. Mr. Stansell did so despite the fact that A. was struggling and choking. Mr. Stansell walked away leaving A. alone in the pool. Mr. Stansell sat three to four feet away in the Jacuzzi with Ms. White talking and laughing. At another point, Mr. Stansell walked away leaving A. floating face down and unmoving in the water. After A., exhausted and waterlogged, crawled out of the pool onto the concrete, Mr. Stansell threw A. back in. Mr. Stansell used profanity toward A. and taunted the youngster. In a loud and upset voice, he called the drowning child "stupid" and a "dumb ass." There was evidence Mr. Stansell: slapped A. in the back of the head with an open hand; held A. underwater and punched the youngster with a closed fist at least three times; threw A. from the deep end of the pool to the shallow end; and forcefully shoved and dragged A. out of the pool. A. landed hard on concrete. A. was crying and coughing up water. Mr. Stansell stood over A. and yelled at the youngster to "man up" and to "get up." Mr. Stansell threatened A. Mr. Stansell said, "[Y]ou better get up or I'm going to fuck you up." Mr. Stansell forced A. to stand upright. Mr. Stansell backed away from A. even though the youngster was visibly dizzy and stumbling. Mr. Stansell watched as A. fell face forward to the concrete. A. was unconscious. Mr. Stansell walked away leaving A. on the ground. Mr. Stansell returned, grabbed A. by one arm and dragged the youngster toward the Jacuzzi. Finally, Mr. Stansell carried the unconscious child into the family's apartment.

Firefighters found A. lying on the apartment floor. There was evidence: A. was shivering, hyperventilating and unresponsive; showed signs of brain injury from lack of oxygen; had a significantly swollen hematoma on his forehead, the result of an impact; had two chipped front teeth, and a swollen lip; and was bleeding from his mouth. At

17

trial, A. could not recall what happened after he was thrown into the pool except that he swallowed water. The jury could reasonably conclude Mr. Stansell: was cruel and excessively abusive both physically and verbally; displayed extreme and callous indifference to A.'s plight, including the youngster's need for medical intervention; and, with the intent to cause cruel or extreme pain or suffering for the purpose of persuasion or for a sadistic purpose, inflicted great bodily injury on A.

Mr. Stansell argues application of the torture statute to his conduct violated his substantive due process rights under the federal Constitution. Mr. Stansell contends, "The application of section 206 . . . in this case violates substantive due process . . . by reaching conduct that does not rationally relate to the [statutory purpose] to justify imposition of a life sentence." Mr. Stansell reasons, "The torture statute, as applied in this case, infringes on [defendant's] right to liberty; its application is irrational by placing a lifelong restraint on his liberty for his overreaching and misguided swim lesson, the unintended consequences of which [were A.'s injuries]." Mr. Stansell claims his conduct was not sufficiently heinous and A.'s injuries were not sufficiently gruesome to support a torture conviction. Mr. Stansell did not raise this due process argument in the trial court. (See *People v. Lopez* (2013) 56 Cal.4th 1028, 1050, fn. 10; *People v. Avila* (2006) 38 Cal.4th 491, 527, fn. 22; *People v. Partida* (2005) 37 Cal.4th 428, 433-439.) In any event, because we find sufficient evidence to support the jury's torture verdict, defendant's constitutional claim fails. (*People v. Jennings* (2010) 50 Cal.4th 616, 648-649; *People v. Solomon* (2010) 49 Cal.4th 792, 811, fn. 8.) No separate constitutional discussion is required. (*People v. Avila* (2014) 59 Cal.4th 496, 513, fn. 3; *People v. Solomon, supra,* 49 Cal.4th at p. 811, fn. 8.)

b. Instructional error contention

Mr. Stansell contends it was prejudicial error to instruct the jury it could find him guilty of torture as a natural and probable consequence of child abuse, assault, battery or mayhem. A "natural and probable consequences" theory is a form of aider and abettor

18

culpability. (§ 31; *People v. Chiu* (2014) 59 Cal.4th 155, 158 (Chiu); *People v. Medina* (2009) 46 Cal.4th 913, 920.) As our Supreme Court explained in *Chiu, supra,* 59 Cal.4th at page 158: "There are two distinct forms of culpability for aiders and abettors. 'First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted."' (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.)" Mr. Stansell asserts, "The only purpose of the prosecutor's attempting to [impose liability on a natural and probable consequences theory] was to confuse the jury and lower his burden of proof." Mr. Stansell's trial counsel, Michael Morse, did not object to the natural and probable consequences instruction. As a result, Mr. Stansell forfeited the present argument. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1260; *People v. Hillhouse* (2002) 27 Cal.4th 469, 504.) Even if not forfeited, there was insufficient prejudice under any standard of reversible error. (See *People v. Gamache* (2010) 48 Cal.4th 347, 376; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 101.) As Mr. Stansell concedes, he was tried as a direct perpetrator of the torture. Moreover, the record as a whole demonstrates the jury convicted Mr. Stansell of torture as the direct perpetrator of that crime. It is not reasonably probable the result would have been more favorable to Mr. Stansell had the instruction been omitted as to him.

Mr. Stansell briefly argues our Supreme Court's decision in *Chiu, supra,* 59 Cal.4th at pages 158-159, should be extended to preclude a torture conviction on an aiding and abetting theory of criminal culpability. In *Chiu*, our Supreme Court held: "[A]n aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles. [Citation.]" (*Ibid.*; see *People v. McCoy, supra,* 25 Cal.4th at p. 1117.) As discussed above, Mr. Stansell was not convicted of torture as an aider and abettor. Therefore, the argument is of no consequence to him.

## 2. Ms. White

Ms. White argues there was insufficient evidence of her guilt as an aider and abettor because torture was not a natural and probable consequence of: child abuse; assault by means of force likely to produce great bodily injury; battery with serious bodily injury; or mayhem. Our Supreme Court has explained: "[S]ection 31 provides in relevant part that '[a]ll persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet its commission . . . are principles in any crime so committed.' . . . [¶] Aider and abettor culpability under the natural and probable consequences doctrine is vicarious in nature. [Citations.] 'By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. It imposes a vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense. [Citation.] Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime.' [Citation.] [¶] The natural and probable consequences doctrine is based on the principle that liability extends to reach 'the actual, rather than the planned or "intended" crime, committed on the *policy* [that] . . . aiders and abettors should be responsible for the criminal *harms* they have naturally, probably, and foreseeably put in motion. [Citations.]" (*Chiu, supra,* 59 Cal.4th at pp. 164-165; see *People v. Prettyman* (1996) 14 Cal.4th 248, 260-262.) Further, in *Chiu,* our Supreme Court explained: "Aider and abettor liability under the natural and probable consequences doctrine does not require assistance with or actual knowledge and intent relating to the nontarget offense, nor subjective foreseeability of either that offense or the perpetrator's state of mind in committing it. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 531. . . .) It only requires that under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the nontarget

20

offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant. (*Ibid.*)" (*Chiu, supra,* 59 Cal.4th at pp. 165-166.)

We apply the substantial evidence standard of review set forth above. To begin with, there is substantial evidence Ms. White was a direct perpetrator. Mr. Proctor testified that defendants were teaching A. in a "excessively rough" way. Marvin, the 10-year-old who was in the pool, testified that Ms. White was throwing A., who could not swim, into the pool. According to Mr. Proctor, Ms. White would not allow A. to get out of the pool. While Mr. Proctor was at the pool for 30 to 40 minutes, Ms. White was verbally abusive towards A. Mr. Proctor, while playing volleyball with Mr. Stansell, saw Ms. White in the deep end of the pool with A. Ms. White, while holding onto the pool's edge, kept A., who could barely keep his head above the water, from getting out of the pool. As Ms. White was doing this, A., who was very cold and tired, struggled to keep his head above water. In fact, A. sunk below the water line approximately 10 times while he was with Ms. White. Marvin testified that A. was drowning. Despite the cool weather, both Ms. White and Mr. Stansell left A. in the pool as they sat laughing in the Jacuzzi. Further, Ms. White stood by while A. was floating face down in the pool for 30 seconds. When A. fell face down onto the pool deck, Ms. White yelled for him to get up and spoke to him in an aggressive manner. After A. fell forward onto his face, Ms. White did nothing. Ms. White took no steps to seek paramedic assistance.

Thus, any contention concerning aiding and abetting is irrelevant in terms of evidentiary insufficiency as there is substantial evidence Ms. White tortured A. There was overwhelming evidence Ms. White was present when Mr. Stansell engaged in intentional, cruel, assaultive, abusive conduct toward A. There was also overwhelming evidence she made no effort to intervene, to prevent the extreme harm that was being inflicted on her son. In fact, she participated in the conduct, albeit to a lesser degree. The jury could reasonably find Ms. White's presence, participation and failure to protect A. encouraged Mr. Stansell. The jury could reasonably conclude Ms. White's presence, participation and failure to protect A. also encouraged him to submit rather than resist. (See *People v. Ogg* (2013) 219 Cal.App.4th 173, 179-182; *People v. Rolon* (2008) 160

Cal.App.4th 1206, 1212-1219; *People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 740-746.) Moreover, a reasonable person in Ms. White's position would or should have known that torture would result absent her intervention to stop Mr. Stansell. Mr. Stansell's conduct was so extreme that a reasonable person would or should have foreseen he would inflict great bodily injury. In other words, the jury could reasonably conclude torture was a natural and probable consequence of the child abuse, assault, battery or mayhem.

Ms. White argues the natural and probable consequences instruction allowed the jury to convict her of torture—a continuous course of conduct crime—without making two findings. Ms. White contends the instructions erroneously did not require the jurors to first, identify the actual perpetrator and second, unanimously agree on the particular act that was aided and abetted. Ms. White never objected to the instruction in the trial court on these grounds. As a result, she forfeited the present argument. (*People v. Lucas* (2014) 60 Cal.4th 153, 291, fn. 51; *People v. Virgil* (2011) 51 Cal.4th 1210, 1260.) Even if not forfeited (§ 1259; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 432), no such determination or agreement was required. (*People v. Culuko* (2000) 78 Cal.App.4th 307, 324-329; see *People v. Prettyman, supra,* 14 Cal.4th at pp. 267-268; Levenson, et al., Cal. Criminal Law (The Rutter Group 2014-2015) ¶ 3:6.)

Ms. White further asserts the natural and probable consequences instruction allowed the jury to find her guilty of torture without requiring it to find at least one of the defendants harbored the requisite specific intent for torture. We disagree. This case was tried on the theory Mr. Stansell perpetrated the torture. Further, the case was tried on the theory Ms. White aided and abetted Mr. Stansell's conduct and torture was a natural and probable consequence thereof. In convicting defendants of torture, the jury necessarily found Mr. Stansell had the requisite intent. (See *People v. Culuko, supra,* 78 Cal.App.4th at pp. 328-329; Levenson, et al., Cal. Criminal Law, *supra,* ¶ 3:6.)

Ms. White has not raised any specific argument based on *Chui, supra*, 59 Cal.4th at pages 161-168. Ms. White's *general* joinder in Mr. Stansell's arguments first asserted in her reply brief is legally insufficient and thus is forfeited. (*People v. Bryant* (2014) 60

22

Cal.4th 335, 408; *People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.)   In any event, *Chui* is inapplicable.

Chui was concerned with an aider and abettor's liability on a natural and probable consequences theory for *first degree murder*.  First degree murder requires that the perpetrator act willfully, deliberately and with premeditation.  Our Supreme Court in *Chiu* held such a mental state is unique.  The unique aspect of the willful, deliberate and premeditated finding mental state was explained in *Chiu* by our Supreme Court thusly: "That mental state is uniquely subjective and personal.  It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080; *People v. Anderson* (1968) 70 Cal.2d 15, 26-27.)"  (*Chiu*, *supra*, 59 Cal.4th at p. 166.)

Our Supreme Court also held the public policy underlying aider and abettor liability is satisfied by an accomplice's second degree murder conviction:  "In the context of murder, the natural and probable consequences doctrine serves the legitimate public policy concern of deterring aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing.  A primary rationale for punishing such aiders and abettors—to deter them from aiding or encouraging the commission of offenses—is served by holding them culpable for the perpetrator's commission of the nontarget offense of second degree murder.  (*People v. Knoller* (2007) 41 Cal.4th 139, 143, 151-152 [second degree murder is the intentional killing without premeditation and deliberation or an unlawful killing proximately caused by an intentional act, the natural consequences of which are dangerous to life, performed with knowledge of the danger and with conscious disregard for human life].)"  (*Chiu*, *supra*, 59 Cal.4th at p. 165.).

By contrast, the crime of torture is not divided into degrees based on a uniquely subjective or personal intent element.  And the public policy concerns discussed in *Chiu* are satisfied if Ms. White is responsible for Mr. Stansell's violent conduct.  Under the natural and probable consequences doctrine she is responsible for the natural and

23

probable consequences of her aiding and abetting child abuse, assault, battery and mayhem. She could have intervened but chose not to do so. These factors have no relationship with the first and second degree culpability and policy factors discussed in *Chiu*.

## B. Mayhem

Defendants were each convicted of mayhem in violation of section 203. Defendants assert there was insufficient evidence A. suffered a permanently disfiguring or disabling injury. Section 203 provides, "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem." The modern underlying principle of mayhem is preservation of the human body's natural completeness and normal appearance. (*People v. Santana* (2013) 56 Cal.4th 999, 1004; *People v. Newble* (1981) 120 Cal.App.3d 444, 451.) A disabling injury must be more than slight and temporary. (*People v. Santana, supra,* 56 Cal.4th at p. 1007; see *People v. Thomas* (1979) 96 Cal.App.3d 507, 512, disapproved on another point in *People v. Kimble* (1988) 44 Cal.3d 480, 496 & fn. 12.) A disfiguring injury must be permanent. (*People v. Santana, supra,* 56 Cal.4th at p. 1007; *People v. Newby* (2008) 167 Cal.App.4th 1341, 1347.) An injury may be permanent even though cosmetically repaired or repairable. (*People v. Santana, supra,* 56 Cal.4th at p. 1007; *People v. Newby, supra,* 167 Cal.App.4th at p. 1348.)

The well-settled rules governing the assessment of evidentiary sufficiency have been set forth above. Here, as a result of Mr. Stansell's intentional wrongful conduct, A. suffered a fractured adult front tooth. The tooth was completely fractured above the gum line. The entire right front tooth was severed from the portion above it. The tooth was cosmetically repaired but continued to cause A. pain. A. was instructed not to bite down on it. This was substantial evidence supporting the injury element of defendants' mayhem convictions. (See, e.g., *People v. Caldwell* (1984) 153 Cal.App.3d 947, 952

24

[defendant bit through victim's lower lip]; *People v. Keenan* (26) 227 Cal.App.3d 26, 29, 33-34, 35-36 [cigarette burns on both breasts leaving scars]; *People v. Newble, supra,* 120 Cal.App.3d at p. 448 [three-inch facial laceration]; *People v. Thomas, supra,* 96 Cal.App.3d at p. 512 [disabled ankle continuing for more than six months]; *People v. Foster* (1934) 3 Cal.App.2d 35, 37-38 [defendant bit off part of victim's ear].)

Mr. Stansell argues, "[Defendant's] intent as to committing mayhem is not at all inferable from the injuries sustained by A." Mr. Stansell contends: A. did not drown; there was no medical evidence A.'s lungs had filled with water; there was no evidence of brain damage from oxygen deprivation; and A. fell of his own accord and cracked his tooth. Mr. Stansell claims, without citing any evidence in support, that A. fainted because he was immersed in hot water after being in the pool for almost two hours. Ms. White asserts the evidence was insufficient as to her in that, "[T]here is no evidence that [she] had any intent to act maliciously or with the intent to injure someone else . . . ."

Mayhem is a general intent crime. (*People v. Park* (2003) 112 Cal.App.4th 61, 64; *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1226.) No specific intent to maim or disfigure is required. (*People v. Newby, supra,* 167 Cal.App.4th at p. 1347; *People v. Hayes* (2004) 120 Cal.App.4th 796, 804-805; *People v. Sekona* (1994) 27 Cal.App.4th 443, 453; *Goodman v. Superior Court* (1978) 84 Cal.App.3d 621, 624.) "Maliciously" within the meaning of section 203 means an intent to vex, annoy or injure, or an intent to do a wrongful act. (*People v. Santana, supra,* 56 Cal.4th at p. 1007; *People v. Bryan* (1961) 190 Cal.App.2d 781, 787.) The requisite malice may be inferred from the fact of the injury resulting from intentional conduct. (*People v. Hayes, supra,* 120 Cal.App.4th at p. 805; *People v. Villegas, supra,* 92 Cal.App.4th at p. 1226; *People v. Sekona, supra,* 27 Cal.App.4th at p. 457.) As the Court of Appeal explained in *People v. Nunes* (1920) 47 Cal.App. 346, 349, "If a person unlawfully strikes another, not with the specific intent to commit the crime of mayhem, and the blow so delivered results in the loss or disfigurement of a member of the body of the assaulted party . . . , the crime is nevertheless mayhem. [Citations.]" (Accord, *People v. Park, supra,* 112 Cal.App.4th at p. 64 ["the crime is mayhem if the blow results in putting out the eye even if the person

who unlawfully strikes another does not have the specific intent to commit the offense"]; *People v. Villegas, supra,* 92 Cal.App.4th at p. 1226 [same].)

Here, the jury could reasonably conclude Mr. Stansell's intentional, abusive, assaultive conduct, aided and abetted by Ms. White, resulted in A. suffering a fractured adult tooth. After two hours of nearly drowning, A. was unable to stand. When forced to do so, he was visibly unsteady. Nevertheless, defendants backed away and allowed A. to fall face first to the concrete. The jury could infer the requisite malice from the fact of that injury.

## C. Battery

Mr. Stansell contends battery with serious bodily injury is a lesser included offense of simple mayhem, therefore he could not be convicted of both crimes. (See *People v. Ausbie* (2004) 123 Cal.App.4th 855, 859, disapproved on a related point in *People v. Santana, supra,* 56 Cal.4th at pp. 1010-1011 & fn. 6 [Court of Appeal accepted concession that battery with serious bodily injury is a lesser included offense of simple mayhem].) The test for a lesser, necessarily included offense is as follows: "[I]f the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former." (*People v. Reed* (2006) 38 Cal.4th 1224, 1227; accord, *People v. Sloan* (2007) 42 Cal.4th 110, 117.) Where a defendant has been convicted of the greater offense, he or she cannot be punished *or convicted* for the lesser offense. (*People v. Reed, supra,* 38 Cal.4th at p. 1227; *People v. Montoya* (2004) 33 Cal.4th 1031, 1034.) The statutory elements test is applied to determine whether one charged offense is necessarily included in another charged offense. (*People v. Sloan, supra,* 42 Cal.4th at pp. 113-114; *People v. Reed, supra,* 38 Cal.4th at p. 1231.)

We have previously identified the elements of mayhem. (See pages 34-36 above.) As noted above, mayhem is a general intent crime. Pursuant to section 242, "A battery is any willful and unlawful use of force or violence upon the person of another."

Aggravated battery occurs, "When a battery is committed against any person and serious bodily injury is inflicted . . . ." (§ 243, subd. (d).) "Serious bodily injury" within the meaning of section 243, subdivision (d), means, "[A] serious impairment of physical condition, including, but not limited to, the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement." (§ 243, subd. (f)(4).) Under these statutory definitions, acts constituting an aggravated battery are necessarily satisfied by acts of simple mayhem. (1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against the Person, § 85, p. 875.) An injury amounting to mayhem is necessarily a serious bodily injury within the meaning of section 243, subdivision (d). Thus, as substantial evidence supports defendants' convictions of simple mayhem, defendants' convictions of battery with serious bodily injury must be reversed. In addition, the per count assessments imposed under Government Code section 70373, subdivision (a)(1), and section 1465.8, subdivision (a)(1), must be reduced to $120 and $160 respectively. (*People v. Rios* (2013) 222 Cal.App.4th 542, 576; see *People v. Sencion* (2012) 211 Cal.App.4th 480, 484-485 [court operations and facilities assessments apply to each count of which a defendant is convicted]; *People v. Castillo* (2010) 182 Cal.App.4th 1410, 1415, fn. 3 [same].)

## D. Booking Photograph

Mr. Stansell asserts the trial court's failure to exclude an "unflattering" booking photograph was prejudicial error. Mr. Stansell reasons, "The booking photograph likely swayed the jury to find that his mean-looking face was indicative of his mean character and criminal intent." At trial, Deputy Martinez testified, without objection, that the booking photograph was, "[A]n accurate photograph of defendant Stansell at or near the time he was arrested." As noted above, Mr. Stansell was arrested shortly after committing the present crimes. Mr. Stansell did not raise an Evidence Code section 352 objection in the trial court. As a result, this argument was forfeited. (*People v. Valdez*

27

(2012) 55 Cal.4th 82, 138; *People v. Alexander* (2010) 49 Cal.4th 846, 905.) Even if not forfeited, we find no manifest abuse of discretion resulting in a miscarriage of justice. (*People v. Williams* (2013) 58 Cal.4th 197, 267; *People v. Thomas* (2011) 51 Cal.4th 449, 485.) The booking photograph was edited so that no booking number or other evidence of its source remained. And, contrary to Mr. Stansell's assertions, his booking photograph does not depict him as "frowning, sullen, cross, mean-looking, and disheveled" or otherwise surly. The trial court could reasonably conclude how Mr. Stansell looked on the date he was arrested was relevant as a comparison to his appearance at trial. The trial court could further conclude that the probative value was not substantially outweighed by any prejudicial effect. (Evid. Code, § 352.) Even if the trial court abused its discretion, any error was harmless under any standard of reversible error. There was overwhelming evidence of Mr. Stansell's guilt. There is no reasonable probability the booking photograph swayed the jury to convict Mr. Stansell.

### E. Prosecutorial Misconduct

Mr. Stansell argues Deputy District Attorney Jon Hatami committed numerous acts of misconduct, the cumulative effect of which requires reversal of the judgment. Mr. Stansell's counsel did not object to the purported misconduct in the trial court. And we are not persuaded that an objection and request for admonishment would have been futile. As a result, Mr. Stansell forfeited his prosecutorial misconduct claims. (*People v. Fuiava* (2012) 53 Cal.4th 622, 679-680; *People v. Crew* (2003) 31 Cal.4th 822, 839.)

In any event, we find no misconduct. Mr. Hatami properly argued the facts of the present case amounted to torture and mayhem. Mr. Hatami did not misled the jury to believe it could find Mr. Stansell guilty of torture based solely on a natural and probable consequences theory. It was undisputed, and the jury no doubt understood, that Mr. Stansell was tried as the direct perpetrator of the torture. Nor do we find that Mr. Hatami: improperly accused defense counsel, Michael Morse, of lying about the law; improperly invoked the prestige of his office to bolster his case; or referenced defendants' booking photographs in an effort to disparage their character and prove

28

criminal intent. Mr. Hatami's arguments were permissible responses to Mr. Morse's closing argument. Even if there had been misconduct, it is not reasonably probable a result more favorable to Mr. Stansell would have been reached absent the misconduct or with a curative admonition. (*People v. Tully* (2012) 54 Cal.4th 952, 1010; *People v. Crew, supra,* 31 Cal.4th at p. 839.)

## F. Great Bodily Injury Infliction

Ms. White challenges the sufficiency of the evidence to support the great bodily injury infliction finding under section 12022.7, subdivision (a), as to the child abuse and assault charges. Ms. White asserts: "[T]here is no evidence to support the conclusion that [she] personally inflicted great bodily injury. Her liability was premised on the theory that she aided and abetted [Mr.] Stansell, who made all physical contact with A. during the incident. . . . There was evidence that she prevented A. from holding onto the ledge of the pool for a brief period of time while [Mr.] Stansell played volleyball. . . . However, . . . this cannot be considered personal infliction of great bodily injury, even assuming, arguendo, there [was] evidence suggesting that A.'s injuries were caused by having to remain in the middle of the pool, rather than hanging onto the edge. At best, there is only proximate cause, though that link itself is tenuous because of the lack of medical evidence suggesting that A.'s problems began at the outset of his swimming lesson."

The section 12022.7, subdivision (a) enhancement applies only to a person who personally inflicts injury. (*People v. Cole* (1982) 31 Cal.3d 568, 572, 579; see *People v. Modiri* (2006) 39 Cal.4th 481, 485; *People v. Bland* (1995) 10 Cal.4th 991, 998, fn. 3.) The word "personally" in section 12022.7, subdivision (a) excludes liability as an aider and abettor. (*People v. Cole, supra,* 31 Cal.3d at pp. 572, 579; see *People v. Elder* (2014) 227 Cal.App.4th 411, 418.) But more than one person may be found to have been involved in directly inflicting great bodily injury. (*People v. Elder, supra,* 227 Cal.App.4th at pp. 419-420; cf. *People v. Wilson* (2013) 219 Cal.App.4th 500, 512.) Our

29

Supreme Court has held that to "personally inflict" injury within the meaning of section 12022.7 means, "[The defendant] directly and not through an intermediary, 'cause[s] something (damaging or painful) to be endured.' [Citation.]" (*People v. Cross, supra,* 45 Cal.4th at p. 68; cf. *People v. Warwick* (2010) 182 Cal.App.4th 788, 794.) But to personally inflict injury does not require affirmative action. A failure to act where action is required may also amount to personal infliction. (*People v. Warwick, supra,* 182 Cal.App.4th at p. 795; 3 Witkin & Epstein, Cal. Criminal Law*, supra, Punishment*, § 352, p. 541.)

There was sufficient evidence for a reasonable jury to conclude Ms. White personally inflicted great bodily injury on A. As noted above, for a significant period of time—20 to 30 minutes—Ms. White prevented her drowning son from exiting the pool. Moreover, Ms. White failed to act where action was required to protect her son from Mr. Stansell's intentional, abusive and assaultive conduct resulting in great bodily injury to A.

## G. CALCRIM No. 3405: Parental Right To Punish

Defendants contend the trial court had a sua sponte duty to instruct with CALCRIM No. 3405. The instruction states: "A (parent/guardian) is not guilty of ___ if (he/she) used (justifiable physical force/ [(a/or) another] justifiable method) to discipline a child. (Physical force/ [or] [other method of punishment] is justifiable if a reasonable person would find that punishment was necessary under the circumstances and that the (physical force/ [or] method) used was reasonable. [¶] The People must prove beyond a reasonable doubt that the (force/ [or] method of punishment) used was not justifiable. If the People have not met this burden, you must find the defendant not guilty of _____." (CALCRIM No. 3405, parenthetical instructions omitted.) The Court of Appeal has explained: "A parent has a right to reasonably discipline by punishing a child and may administer reasonable punishment without being liable for a battery. (*Emery v. Emery* (1955) 45 Cal.2d 421, 429; *People v. Stewart* (1961) 188 Cal.App.2d 88, 91.) This includes the right to inflict reasonable corporal punishment. (*People v. Curtiss* (1931)

30

116 Cal.App. Supp. 771, 775.) [¶] However, a parent who willfully inflicts *unjustifiable* punishment is not immune from either civil liability or criminal prosecution. (*People v. Stewart, supra,* 188 Cal.App.2d 88, 91; *People v. Curtiss, supra,* 116 Cal.App. Supp. 771, 777.) . . . [C]orporal punishment is unjustifiable when it is not warranted by the circumstances, i.e., not necessary, or when such punishment, although warranted, was excessive. [(*People v. Curtiss, supra,*] 116 Cal.App.] at p. Supp. 780.) '[B]oth the reasonableness of, and the necessity for, the punishment is to be determined by a jury, under the circumstances of each case.' (*Id.* at p. Supp. 777.)" (*People v. Whitehurst* (1992) 9 Cal.App.4th 1045, 1050; see *Emery v. Emery, supra,* 45 Cal.2d at pp. 429-430 [child has a right to freedom from a parent's willful or malicious misconduct causing injury].) Here, no reasonable juror could conclude defendants were engaging in necessary discipline or that the physical force used was reasonable. Therefore, the trial court had no duty to instruct with CALCRIM No. 3405. (See *People v. Clark* (2011) 201 Cal.App.4th 235, 252-253; *People v. Checketts* (1999) 71 Cal.App.4th 1190, 1197.)

### H. Unanimity Instruction

Ms. White challenges her convictions of child abuse, torture, assault with a deadly weapon, battery, false imprisonment by violence, and mayhem, because no unanimity instruction, CALCRIM No. 3550, was given. It is well established that no unanimity instruction is required when the wrongful acts are closely connected and take place over a relatively short period of time. (E.g., *People v. Benavides* (2005) 35 Cal.4th 69, 98 [lewd conduct upon a child]; *People v. Stankewitz* (1990) 51 Cal.3d 72, 100 [robbery]; *People v. Crandell* (1988) 46 Cal.3d 833, 875 [murder]; *People v. Napoles* (2002) 104 Cal.App.4th 108, 115-117 [child abuse]; *People v. Rae* (2002) 102 Cal.App.4th 116, 122-124 [elder abuse]; *People v. Jenkins* (1994) 29 Cal.App.4th 287, 297-300 [torture]; *People v. Vargas* (1988) 204 Cal.App.3d 1455, 1464 [child abuse].) In *Napoles,* the Court of Appeal held, "'[W]here . . . the evidence establishes a pattern of physical trauma inflicted upon a child within a relatively short period of time, *a single course of conduct*

*is involved* and no justification exists for departing from the well-established rule . . . that jury unanimity is not required . . . .' (*People v. Napoles, supra,* 104 Cal.App.4th at p. 116, quoting *People v. Vargas, supra,* 204 Cal.App.3d at p. 1464.)  Further, as our Supreme Court has held, "'[T]he "continuous conduct" rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them.'"  (*People v. Williams* (2013) 56 Cal.4th 630, 682, quoting *People v. Stankewitz, supra,* 51 Cal.3d at p. 100; accord, *People v. Ervine* (2009) 47 Cal.4th 745, 788.)  The acts constituting the crimes of which Ms. White was convicted were closely connected and occurred over a two-hour period in a single place.  Defendants offered the same defense to all of the acts.  Mr. Stansell claimed to only be trying to teach A. to swim.

### I.  Evidence Code Section 1109 Prior Convictions

Ms. White asserts reversible error in the admission of her prior convictions under of Evidence Code section 1109.  Our review is for a manifest abuse of discretion upon finding the trial court's decision was palpably arbitrary, capricious, and patently absurd.  (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314-1315.)  The trial court did not abuse its discretion.  Ms. White's prior convictions were admissible under Evidence Code section 1109 precisely because they suggested a propensity for abuse, neglect and physical violence.  The former neglect of her child and physical violence towards her mother in her children's presence were sufficiency similar to the present crimes to support the intended inference.  (See *People v. Johnson, supra,* 185 Cal.App.4th at pp. 531-532; *People v. Morton* (2008) 159 Cal.App.4th 239, 245-247.)  Even if the trial court had abused its discretion, there is no possibility the verdicts would have been more favorable to Ms. White absent the prior acts evidence.  Six independent witnesses testified to the abusive, assaultive conduct by both parents.  Ms. White not only participated in the abuse of her son but failed to protect him from abuse by another.

## IV.  DISPOSITION

Defendants' battery with serious bodily injury convictions are reversed.  These are to be dismissed.  The assessments imposed on each defendant pursuant to Government Code section 70373, subdivision (a)(1) and Penal Code sections 1465.8, subdivision (a)(1) are reduced to $120 and $160 respectively.  The judgments are affirmed in all other respects.  Upon remittitur issuance, the clerk of the superior court is to prepare amended abstracts of judgment and deliver a copies to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHE IN THE OFFICIAL REPORTS

TURNER, P.J.

I concur:

33

GOODMAN, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Mosk, J., Concurring and Dissenting

I dissent as to the convictions on Count 5, mayhem, and Count 6, torture. Although defendants treated the child abysmally and criminally, the convictions for mayhem and torture, which carries life sentences, are legally inappropriate and unjust. The conduct involved, although serious, is no worse than we see in many dependency cases that do not even result in prosecutions. (See, e.g., 10 Witkin, Summary of Cal. Law (10th ed. 2005) Parent and Child, § 546, p. 670 [child not even removed from Parent for severe physical abuse unless social worker makes required allegation]; *In re Joshua H.* (1993) 13 Cal.App.4th 1718, 1726; Welf. & Inst. Code, § 332; Myers, Symposium: Child Abuse (1996) 28 Pac. L.J. 1.)[1] The convictions of a mother and her boyfriend—who are very young and obviously immature—for torture and mayhem, resulting in life imprisonment sentences are not in accordance with the applicable statute and serve no useful purpose and certainly are not in the best interests of the child.

A.     Torture

1.     Lack of Substantial Evidence

Torture under Penal Code section 206 is when a person "inflicts great bodily injury" "with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose."[2] None of the published torture cases involves anything similar to the type of acts here. There is no indication that defendants held the child under water, forced him to swallow water, intended to

---

[1]     It is reported that the "1980s witnessed a significant increase in the prosecution of child abuse." (Myers, "*A Decade of International Legal Reform Regarding Child Abuse Investigation and Litigation: Steps Toward a Child Witness Code*" (1996) 28 Pac. L.J. 169-170.)

[2]     Apparently California and Michigan are the only two states that have specific anti-torture statutes. (Browne, *Tortured Prosecuting: Closing the Gap on Virginia's Criminal Code by Adding a Torture Statute* (2014) 56 Wm. & Mary L.Rev. 269, 275 (Browne).

cause his hyperthermia, or otherwise intended to inflict cruel or extreme pain or suffering upon the child so as to constitute torture. Defendants' overly harsh and unacceptable measures to teach the child to swim do not fit within the type of heinous conduct deemed to be torture and deserving of a life sentence.

Penal Code section 206 was enacted in response to the facts in *People v. Singleton* (1980) 112 Cal.App.3d 418, in which a defendant kidnapped and sexually abused his victim, chopped off her hands, and dumped her in a ditch in a remote location. He was sentenced to fourteen years and four months in prison and was paroled after serving seven years. The crime of torture was included in Proposition 115 "to insure that crimes such as Singleton's receive a minimum punishment of life imprisonment." (Sen. Com. on Judiciary, Assem. Com. on Public Safety, Joint Hearing on Crime Victims Justice Reform Act (1990) § 3, at p. 005; see Glynn, *Review of Selected (1990) California Legislation —Addendum—Proposition 115: The Crime Victims Justice Reform Act* (1990-1991) 22 Pacific L.J. 1010, 1012). This case does not resemble the type of case for which Penal Code section 206 was promulgated.

I realize that the crime of torture has been judicially expanded (see *People v. Assad* (2010) 187 Cal.App.4th 187, 196; *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1426-1430.) I agree with those justices who conclude that such expansion "'redefine[s], and minimize[s], the gruesome and sadistic nature of torture, which has long been recognized as among the most heinous of human conduct . . . .' ( *People v. Jung, supra,* 71 Cal.App.4th at p. 1049 (dis. opn. of Armstrong, J.).)" (*People v. Pre* (2004) 117 Cal.App.4th 413, 426 (conc. & dis. opn. of McIntyre, J.); see also *People v. Misa* (2006) 140 Cal.App.4th 837, 847-848 (conc. opn. of McIntyre, J.); see also Browne, *supra,* 56 Wm. & Mary L.Rev. at p. 297.)

2.      Natural and Probable Consequences Instruction

Defendant Stansell was tried as a direct perpetrator; yet the trial court gave a natural and probable consequences instruction and the prosecutor argued a natural and probable consequences theory. At oral argument, the Attorney General commented that this was an error but said it was not prejudicial. However, it allowed the jury to find

2

Stansell guilty of torture without the requisite proof of intent.  There was no forfeiture for failure to object in this case, for the error affected defendant's substantial rights.  (*People v. Valdez* (2012) 55 Cal.4th 82, 151.)

As to defendant White, the trial court erred because the jury instruction did not ask the jury to determine who was the actual perpetrator and allowed the jury to find her guilty without her being the perpetrator or aider or abettor.  In short, the jury was allowed to find White guilty of the specific intent crime of torture even though criminal negligence may have been the basis of a jury finding of guilt of one of the listed target crimes.  "[W]hen the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand."  (*People v. Green* (1980) 27 Cal.3d 1, 69, superseded by statute on other grounds, quoting *People v. Stanworth* (1974) 11 Cal.3d 588, 601, superseded by statute and overruled on another ground in *People v. Martinez* (1999) 20 Cal.4th 225, 237.)  Similarly, As White's substantial rights were affected, she has not forfeited her contentions.

B.      Mayhem

The child fell and chipped a tooth.  Somehow this resulted in the crime of mayhem.  A person is guilty of mayhem "who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip . . . ."  (Pen. Code, § 203).  The offense of mayhem punishes a person for causing permanent disfigurement.  (See *Goodman v. Superior Court* (1978) 84 Cal.App.3d 621, 625).

Here the child's tooth was restored.  He was not disfigured or disabled.  Under the prosecution's theory, any time an assault or battery results in a cracked tooth, that would constitute the crime of mayhem.  Defendants did not even intend that the child suffer a cracked tooth.  His fainting and subsequent fall resulted in the cracked tooth.  What

3

occurred here was not even close to the type of mutilation associated with the crime of mayhem.

What occurred here is not only contrary to law, but unjust.  As Justice Cardozo once wrote, "The law has 'its cesspools of ebb and flow.'  One of the flood seasons is upon us.  Men are insisting, as perhaps never before, that law shall be made true to its ideas of justice.  Let us gather up the driftwood, and leave the waters pure."  (Cardozo, *A Ministry of Justice* (1921) 35 Harv. L.Rev. 113, 126.)

I would reverse the convictions based on torture and mayhem, otherwise would affirm the judgment, and would remand for resentencing.


MOSK, J.